UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| CPC LOGISTICS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 4:13-CV-00228-JCH |
| | ) |
| ABBOTT LABORATORIES, INC., | ) |
| | ) |
| Defendant. | ) |

**ABBOTT LABORATORIES, INC.'S MEMORANDUM IN SUPPORT
OF ITS MOTION TO DISQUALIFY MICHAEL HARRIS AS COUNSEL
FOR PLAINTIFF AT TRIAL AND FOR CERTAIN DEPOSITIONS AND TO
COMPEL HARRIS AND HARRIS, DOWELL, FISHER & HARRIS, LC
TO RESPOND TO SUBPOENAS FOR DOCUMENTS AND DEPOSITION**

# INTRODUCTION

Plaintiff CPC Logistics ("CPC") seeks over $3 million from Abbott Laboratories, Inc. ("Abbott") stemming from "withdrawal liability" assessed against CPC by the Central States Pension Fund (the "Fund") in 2009.[1] Abbott recently learned, however, that Plaintiff's counsel in this litigation, Mike Harris ("Harris"), is the sole witness who can testify as to key aspects of CPC's calculation, negotiation, allocation and resolution of withdrawal liability with the Fund. Indeed, from late 2009 through late 2010, CPC's former President explained that it was Harris' responsibility to communicate with the Fund regarding calculations related to the withdrawal liability. To that end, the record is replete with scores of written communications between Harris and the Fund.

When Abbott first saw these communications in CPC's production, Abbott subpoenaed Harris for a deposition and sought documents related to communications between him or his firm and the Fund. Harris and his firm objected, arguing that the materials sought were privileged or already produced by CPC. Harris further downplayed his role in the negotiations with the Fund, claiming that CPC's former President, John Bickel ("Bickel"), was equally knowledgeable as to the communications and negotiations between CPC and the Fund. Because Abbott was reluctant to wait until Bickel's deposition to seek recourse should Abbott be correct that Harris is a necessary fact witness, Harris agreed on behalf of CPC not to object to a motion, such as this one, as untimely if brought promptly after Bickel's deposition.

---

[1] In 2009, CPC decided to cease contributions to the Fund on behalf of its truck-driver employees. This is known as a withdrawal. Upon withdrawal, the Fund assessed a penalty against CPC to account for, among other things, unfunded vested benefits. This is known as withdrawal liability.

Abbott deposed Bickel on February 14, 2014. Bickel's testimony confirmed Abbott's fears. Bickel repeatedly testified that Harris was the individual most knowledgeable about CPC's negotiations and communications with the Fund related to withdrawal liability. Bickel further confirmed that Harris was the only person who communicated directly with Fund employee, Andrew Sprau ("Sprau"), regarding the allocation and calculation of withdrawal liability. Harris, therefore, is a necessary fact witness; he is the only person who can attest to CPC's positions, negotiations and communications with the Fund.

To make matters worse, Harris repeatedly instructed Bickel not to answer questions regarding communications, negotiations and settlement positions with the Fund.[2] In doing so, Harris impeded Abbott's attempt to get this information from a second-hand source. Then, on February 17, 2014, Harris subpoenaed Sprau for a deposition. Thus, while Harris has obstructed Abbott's attempts to get this information at every turn, he now seeks to depose Sprau on the very subject matter on which Harris is a witness and the conversations Harris had with Sprau. This is unfair and unduly prejudicial.

Abbott does not take motions to disqualify counsel lightly. Abbott thus gave CPC every opportunity to demonstrate that Harris is not serving dual roles. It is now clear that the opposite is true. Harris' communications and dealings with the Fund are central to this litigation. Accordingly, Abbott respectfully requests that this Court find Harris to be a necessary witness and enter an order providing the relief requested herein to protect Abbott from any further prejudice from Harris' dual roles.

---

[2] Harris' improper objections are the subject of a concurrent motion for relief under Rule 30(d)(2).

**FACTUAL BACKGROUND**

*The Agreement*

In 1992, CPC and Abbott entered into an Agreement whereby CPC agreed to employ and provide drivers for Abbott's trucks at various locations. Essentially a "cost-plus" arrangement, CPC had the sole responsibility to employ and manage all aspects of the drivers' employment. Abbott was invoiced weekly for the drivers' wages, costs and benefits. Some of the drivers employed by CPC and assigned to Abbott were subject to collective bargaining agreements requiring pension fund contributions to the Fund. There is no dispute that Abbott paid all pension fund payments during the duration of the parties' contract.

In 2004, Abbott split into two entities, Abbott and Hospira, Inc. ("Hospira"). As a result, virtually all CPC employees subject to the Fund who previously serviced Abbott were transferred to Hospira. Indeed, by 2005, CPC provided Abbott no drivers subject to the Fund and in 2007 Abbott terminated the contract it its entirety.[3] In 2009, CPC decided to withdraw from the Fund.

*Withdrawal Liability & Harris[4]*

Pursuant to 29 U.S.C. § 1381, *et seq*., an employer is subject to withdrawal liability if it withdraws from a multi-employer pension fund in certain circumstances. This liability is based on a complex calculation and is meant to account for the unfunded vested benefits of those drivers on whose behalf the Fund will no longer be receiving pension payments. When CPC withdrew, the Fund issued an initial notice of assessment of withdrawal liability in the amount of $9,770,183.71. *See* Ex. A, April 21, 2010 Demand from the Fund to CPC.

---

[3] The parties dispute the date of termination.

[4] Harris also appears to have been actively involved in negotiations on behalf of CPC with the unions to ultimately cease participation in the Fund. *See* Ex. B, October 2, 2009 Harris Letter. This too makes him an important fact witness as Abbott has reason to believe promises were made to encourage the unions to permit withdrawal by CPC.

CPC, thereafter, worked with the Fund to assess the calculation, allocate the liability between its entities and customers, and potentially reach an overall resolution. As to these issues, CPC's sole point person was Harris. The record is replete with correspondence between solely Harris and Sprau relating to changes in the calculation of, and allocation of, the liability. For instance, over a period of several months:

- Sprau and Harris exchanged numerous emails regarding the liability amount and possible errors in the calculation. *See* Ex. C, Correspondence (CPC 546-51).

- Harris and Sprau discussed further revisions to the calculation and Harris provides ***his*** ("my") spreadsheet summarizing each CPC customer's contribution. *See*, Ex. C, (CPC0555).

- Harris further splits Abbott's share with Hospira without explanation and relays this on to Sprau. *See* Ex. C, Correspondence (CPC 555).

- Sprau subsequently explains to Harris, "[w]hile I understand that you have split the Abbott (1/3) and Hospira (2/3) amounts for 2004, I can not confirm that this allocation is accurate amongst these two entities." *See*, Ex. C, Correspondence (CPC 562-64).

Harris' communications and underlying analyses all bear directly on CPC's claim in this case, and he is the individual most knowledgeable on these issues. Harris is also, often, the sole participant in the communications on behalf of CPC.

*Abbott's Attempts At Discovery*

Once Abbott discovered these documents and realized that Harris was central to the negotiation and calculation of withdrawal liability, including the apportionment between CPC customers, Abbott promptly sought discovery from Harris and his firm. *See* Ex. D, Subpoenas for Documents and Deposition dated November 19, 2013. Harris objected, assuring Abbott that other witnesses had personal knowledge of these issues. To reassure Abbott that he was not a necessary witness, Harris agreed that CPC would not argue that a motion by Abbott seeking disqualification

was untimely if brought promptly after further discovery. *See* Ex. E, December 16, 2013 email chain between K. Shah and M. Harris.

As discovery continued, Abbott remained skeptical and thus issued a 30(b)(1) deposition notice on this specific topic. *See* Ex. F, Notice of Deposition Pursuant to 30(b)(1) dated January 14, 2014. CPC identified Bickel as the individual with the most knowledge but indicated that he could not be made available until February 13, 2014. *See* Ex. G, January 24, 2014 email from M. Harris. Abbott remained concerned about CPC's delay as to this issue and thus again received confirmation from Harris that CPC would not object to a motion as untimely if promptly brought after the 30(b)(1) deposition. *See* Ex. H, January 24, 2014 email from M. Harris.

Abbott deposed Bickel on February 14, 2014. During that deposition, Abbott's counsel asked a series of questions regarding the interactions between CPC and the Fund. As Abbott suspected, Bickel made clear that the individual with first-hand knowledge and the most familiarity with these topics is Harris. Bickel testified that he never dealt with Sprau directly. *See* Ex. I, Relevant Excerpts of Bickel Deposition, at 62:10-12. Rather, he was clear that Harris was the point person for CPC:

> Q: What was the context of your communications with [Sprau]?
>
> A: Primarily had – my communications with him normally went through Mike Harris. Ex. I at 62:23-63:1.

\* \* \*

> Q: So am I correct that all of your communications to Mr. Sprau at the Central States went through Mr. Harris?
>
> A: Yes. Ex. I at 65:18-21.

\* \* \*

> Q: And so was it Mr. Harris's responsibility to communicate with the fund regarding the calculations for the withdrawal liability.
>
> A: Yes. Ex. I at 66:17-21.

Bickel further confirmed that he delegated to Harris the responsibility to sort out with the Fund any issues or errors identified by CPC. Ex. I at 74:22-75:1. In short, Bickel's testimony leaves no doubt that Harris is an indispensable witness with respect to CPC's communications and positions with the Fund.

Amazingly, Harris went so far as to instruct Bickel not to answer several questions relating to CPC's negotiations with the Fund. Ex. I, 63:1-64:15; 66:22-67:11. Yet, just a day later, Harris issued his own subpoena for the deposition of Sprau. *See* Ex J, Sprau Subpoena. Harris thus seeks to depose Sprau about facts to which only he and Sprau were privy, and to which he prevented Abbott from inquiring about in the Bickel deposition. This is patently unfair and incredibly prejudicial to Abbott.

## APPLICABLE LAW

Both the Missouri Rules of Professional Conduct and federal substantive law are applicable to motions to disqualify. *Sakalowski v. Metron Servs., Inc.*, 4:10CV02052 AGF, 2011 WL 2838129 (E.D. Mo. July 18, 2011) citing *Cole v. Ruidoso Mun. Schs.*, 43 F.3d 1373, 1384 (10th Cir. 1994) and *In re Am. Airlines, Inc.*, 972 F.2d 605, 610 (5th Cir. 1992). Missouri Rule of Professional Conduct 4-3.7 provides in pertinent part:

> (a) A lawyer shall not act as advocate at a trial in which the lawyer is likely to be a necessary witness unless:
>
> (1) the testimony relates to an uncontested issue;
> (2) the testimony relates to the nature and value of legal services rendered in the case; or
> (3) disqualification of the lawyer would work substantial hardship on the client.

Mo. R. Prof. Conduct, Rule 4-3.7.  There are several purposes to this rule.  "Combining the roles of advocate and witness can prejudice the tribunal and the opposing party and can also involve a conflict of interest between the lawyer and client."  Comments to Rule 4-3.7 (2012 Update).

An attorney is a necessary witness, and thus precluded from representation under Rule 4-3.7, when "there are things to which he will be the only one available to testify."  *Macheca Transp. Co. v. Philadelphia Indem. Co.*, 463 F.3d 827, 833 (8th Cir. 2006) quoting *State ex rel. Wallace v. Munton*, 989 S.W.2d 641, 646 (Mo. Ct. App. 1999); *Raster v. Ameristar Casinos, Inc.*, 280 S.W.3d 120, 133 (Mo. Ct. App. 2009).  Attorney witnesses are prohibited from pretrial activity when the "pretrial activity includes obtaining evidence which, if admitted at trial, would reveal the attorney's dual role."  *World Youth Day, Inc. v. Famous Artists Merch. Exch., Inc.*, 866 F. Supp. 1297, 1303 (D. Colo. 1994) (granting motion to disqualify); *Kaplan v. Hohman*, 4:07CV805 HEA, 2007 WL 2121728 (E.D. Mo. July 24, 2007) (granting disqualification motion in part).

While the disqualification rule generally does not apply to pretrial proceedings, the "purpose of the necessary witness rule is to avoid the possible confusion which might result from the jury observing a lawyer act in dual capacities—as witness and advocate."  *Droste v. Julien*, 477 F.3d 1030, 1035 (8th Cir. 2007).  This confusion similarly applies with respect to Harris' attempt to depose Sprau.  It could certainly confuse and cause the jury to place undue weight on Sprau's testimony if Harris is the one soliciting the testimony.  Further, as noted in the comments to Rule 4–3.7, "combining the roles of advocate and witness can prejudice the opposing party..."  Those comments also state that, "the opposing party has proper objection where the combination of roles may prejudice that party's rights in the litigation."

## ARGUMENT

### I. HARRIS IS A NECESSARY WITNESS AND THUS ABBOTT SHOULD BE PERMITTED TO TAKE DISCOVERY OF HARRIS AND HIS FIRM.

Harris is the only person who can provide testimony on behalf of CPC regarding CPC's role, dealings and discussions with the Fund. This cannot be disputed as it comes directly from the sworn testimony of Bickel, CPC's President at the time of the withdrawal liability. Bickel testified that "it Mr. Harris' responsibility to communicate with the fund regarding the calculations for the withdrawal liability." Ex. I at 66:17-21. This makes Harris a necessary witness. Discovery of an attorney who is also a fact witness is appropriate where there is no other means to obtain the information discussed above, the information is relevant and nonprivileged, and the information is crucial to Abbott's preparation of the case. When these factors are present, a party must be allowed to depose opposing counsel. *Shelton v. Am. Motors Corp.*, 805 F.2d 1323, 1327 (8th Cir. 1986); *Cascone v. Niles Home for Children*, 897 F. Supp. 1263, 1265 (W.D. Mo. 1995). As explained above, these factors are present here. The record as to these factors overwhelmingly favors Abbott.

*First*, Harris' testimony is necessary to determine what, if anything, CPC did to determine whether the liability assessed by the Fund is accurate. This goes directly to the propriety of the damages claimed by CPC. Bickel testified that he did not determine whether the amount of liability assessed by the Fund was calculated properly, but imagined that Harris had done so. Ex. I at 27:5-14.[5] To that end, Harris, had numerous communications, without the involvement of

---

[5] When Abbott asked whether it was Harris' responsibility to assess whether the Fund was using the correct formula to calculate CPC's liability, Harris instructed Bickel not to answer. Ex. I, at 66:22-67:11.

others from CPC, regarding the calculation. For example, on August 20, 2010, Harris wrote to Sprau:

> It is important that both of our contribution figures, by customer, are exactly the same because some of the customers have indicated they may want to correspond directly with Central States to confirm the calculation of their pro rata share.

Abbott should be permitted to probe Harris' representations to the Fund of the importance of the figures and the customers that want to deal directly with the Fund regarding their share. In that same email, Harris went on to clarify to the Fund that:

> We are not stipulating to your contribution history, but we are stipulating that, according to Central States' contribution figures, the respective amount of contributions assigned to each customer is accurate. There are still some discrepancies that we may want to research to find out where they came from.

It is, of course, imperative to Abbott to determine the basis of the stipulation that the contributions assigned to each customer are accurate – this is the foundation of CPC's damages claim. Bickel did not know what Harris meant by the statement that CPC was not stipulating to the Fund's contribution history and testified that Abbott would have to ask Harris to find out what this meant. Ex. I at 121:23-123:4 & Bickel Dep. Ex. 29. Equally troubling, Bickel did not know what the "discrepancies" Harris noted were and testified that Abbott would have to ask Harris to find out. Ex. I at 123:9-123:25. Harris thus is absolutely necessary as a witness as only he can attest to what he was referring to.

This is just one example. At one point, after Harris provided Sprau what "should be an accurate breakdown by customer according to Central States' records," Sprau responded that the calculation still had errors and Harris replied "Wow Andy I can't seem to get anything right these days." Ex. C, Correspondence (CPC570-572). Harris asked Sprau to perform calculations on a number of occasions regarding the breakdown amongst CPC's customers, the application of CPC payments to principal and interest and the total amount outstanding. Ex. C, Correspondence

(CPC578-579). Harris is necessary to explain the accuracy, or lack thereof, of the calculation. Harris is the only person who can testify to these conversations and the details of the related calculations. Harris is also the only person who can identify and authenticate documents attached to these communications and testify to whether Harris, another CPC employee, or the Fund, created the documents.

*Second*, Harris' testimony is necessary to determine how CPC allocated the lump sum liability between its customers (and whether it was CPC or the Fund that did so) and communications related to this process. This also goes directly to the propriety of the damages claimed by CPC. Bickel testified that the Fund prepared a document allocating the withdrawal liability among CPC's customers, including Abbott. Ex. I at 19:4-13. However, Bickel later testified that CPC, probably with Harris' involvement, allocated the lump sum liability among CPC's customers to invoice each customer. Ex. I at 21:5-19. Then, Bickel testified that he did not know if a document reflecting this allocation prepared by CPC exists, but if it does, the document would have been given to Harris to forward to the Fund. Ex. I at 25:4-18.

As discussed above, there was extensive correspondence between CPC and the Fund related to the allocation of withdrawal liability among CPC's customers. Indeed, in preparing for another litigation related to withdrawal liability against another customer, Harris emailed Sprau and asked for "a copy of CPC's contribution history relative to International Paper and terminal numbers." Ex. C, Correspondence (CPC583). Harris noted that he would need the same "detailed history of this contribution history" for Abbott when preparing for the instant litigation. *Id*. Likewise, Harris asked Sprau to check and see if contribution history "equals the contribution history the Fund has attributed to International Paper in calculating pro rata portion." Ex. C, Correspondence (CPC582). Clearly, the Fund and CPC collaborated in determining how much of

withdrawal liability to attribute to each of CPC's customers. Harris is the only person who participated in those discussions on behalf of CPC.

*Third*, Harris' testimony is necessary to determine how CPC allocated liability between Abbott and Hospira. This, again, was done by Harris. The Fund specifically informed Harris that "while I understand that you have split the Abbott (1/3) and Hospira (2/3) amounts for 2004, I can not confirm that this allocation is accurate amongst these two entities." Ex. C, Correspondence (CCP562). Harris, and only Harris, can attest to what he did in response.

Harris later sent Sprau an email stating "attached is an updated contribution breakdown that should match your records when taking into account the above allocation with respect to Abbott-Hospira Local 745 terminal…Based on what I know now, this should be an accurate breakdown by customer according to Central States' records." Ex. C, Correspondence (CPC568). Abbott is entitled to know what Harris learned and "know[s] now" to purportedly make the allocation accurate.

The above are just some of the many key areas for which Harris is a necessary witness. He is involved in numerous other communications and events, all of which put his testimony at issue in this litigation. Abbott is entitled to discover this information from the "best source for information" – Harris. *Cascone*, 897 F. Supp. 1263, 1266 (W.D. Mo. 1995). As in *Cascone*, where the court noted that only the attorney could provide a flat out denial of the plaintiff's allegations, it is apparent that there is relevant information regarding conversations between Harris and Sprau that can only be obtained from Harris. *Id*. Such information includes who created documents they exchanged, whether, when and how various calculations were performed and the content of oral conversations between Harris and Sprau. The position CPC took when communicating the Fund on such issues is critical to this case.

Harris' testimony is plainly relevant. A party may discover information concerning "any matter, not privileged, which is relevant to the subject matter involved in the pending action...." Fed. R. Civ. Proc. 26(b)(1). Furthermore, opposing counsel at the outset has the duty to avoid situations where they are likely to be deposed. 897 F. Supp. 1263, 1265. When a party cannot obtain information except from opposing counsel, they are entitled to depose opposing counsel. *Pamida, Inc. v. E.S. Originals, Inc.*, 281 F.3d 726, 731 (8th Cir. 2002) (affirming denial of motion to quash subpoenas). *Pamida* is instructive. There, the plaintiff, a retailer, sought indemnification from a manufacturer related to a patent infringement suit. 81 F.3d 726, 728. The plaintiff used the same attorneys who defended the patent action to prosecute the indemnification action. *Id*. The magistrate and District Court ordered that the plaintiff's attorneys testify and produce documents regarding the indemnification action. *Id*. at 729. This case is akin to an indemnification claim and the same result applies here.

Abbott respectfully requests an order compelling Harris and his firm to produce the documents requested by its Subpoenas and for Harris to sit for his deposition.

## II. HARRIS SHOULD BE DISQUALIFIED FROM TRYING THIS MATTER AND CONDUCTING DEPOSITIONS.

An attorney cannot serve as an advocate and witness in the same case. Harris is a necessary witness for Abbott's defense and therefore should be disqualified from acting as trial counsel. Missouri Rule of Professional Conduct Rule 4–3.7; *State v. Mason*, 862 S.W.2d 519, 521 (Mo. App. 1993). "Although the moving party must satisfy a high standard of proof to sustain a disqualification motion, any legitimate doubts must be resolved in favor of disqualification. *Sakalowski*, 2011 WL 2838129, at * 4 (E.D. Mo. July 18, 2011) citing *Commonwealth Land Title Ins. Co. v. St. Johns Bank & Trust Co.*, No. 4:08–CV–1433 CAS, 2009 WL 3069101, at *4 (E.D. Mo. Sept. 22, 2009).

Bickel's testimony and the documents produced by CPC satisfy Abbott's burden. "[T]o disqualify an attorney as a 'necessary witness' under Rule 4-3.7, there must be a showing that 'there are things to which [the attorney] will be the only one available to testify.'" *United States v. Davidson*, 4:07CR720 CDP (FRB), 2008 WL 1777419 (E.D. Mo. Apr. 16, 2008); *Sakalowski*, 2011 WL 2838129, at * 4 (granting motion to disqualify counsel). As illustrated above, this is unquestionably the case here based on the admissions of CPC's president.

None of the exceptions to Rule 4-3.7, for testimony as to an uncontested issue or legal fees and where disqualification would cause substantial hardship, are applicable here. In some instances, Abbott cannot even determine whether issues are contested without information possessed by Harris. Moreover, CPC cannot claim any hardship since Abbott raised this issue early in the case and CPC asked Abbott to forego any disqualification motion based on its agreement not to object on the basis of timeliness. Exs. E & H.

Rule 4-3.7 requires that Harris be disqualified from acting as trial counsel because he is likely to be a necessary witness. *Cascone*, 897 F. Supp. 1263, 1266 (W.D. Mo. 1995). It is also inappropriate for Harris, *the only person who communicated with Sprau on behalf of CPC regarding the Fund's calculation of liability*, to depose Sprau about the Fund's calculation of liability. As noted in the comments to Rule 4–3.7, "the opposing party has proper objection where the combination of roles may prejudice that party's rights in the litigation."

Abbott's rights are prejudiced here. Here, if Sprau testifies regarding the Fund's calculation of CPC's liability and the allocation of that liability among CPC's customers, both of which are issues about which Abbott intends to inquire, Sprau will be testifying about conversations with Harris. Sprau knows Harris was also involved in these conversations and may give undue weight to any suggestive or leading questions propounded by Harris. Sprau may also

be hesitant to criticize or disagree with positions taken by Harris and CPC. Regardless, the prospect of an attorney deposing a witness about conversations to which only they were privy raises the appearance of impropriety, which is consideration in ruling on a motion to disqualify. *Sakalowski*, 2011 WL 2838129, at * 5 citing *State ex rel. Union Planters Bank, N.A. v. Kendrick*, 142 S.W.3d 729, 740 (Mo. 2004); *see also F.D.I.C. v. U.S. Fire Ins. Co.*, 50 F.3d 1304, 1315 (5th Cir. 1995) (affirming District Court's finding that lawyer-witness rule required disqualification of attorneys who were necessary witnesses)

Harris is a necessary fact witness in this case. Therefore, he must be precluded from acting as trial counsel or taking the depositions of other witnesses regarding events in which he participated.

**CONCLUSION**

For relief, Abbott respectfully requests that this Court: (1) compel Michael Harris and Harris, Dowell, Fisher & Harris, LC to respond to the Subpoenas *Duces Tecum* previously served on them; (2) compel Michael Harris to sit for a deposition pursuant to the previously served Subpoena; (3) disqualify Michael Harris from acting at trial counsel in this matter; (4) disqualify Michael Harris from taking the deposition of Andrew Sprau and any other individual whose communications with Harris are discoverable in this case; and (5) grant all other appropriate relief.

February 26, 2014         Respectfully submitted,

THOMPSON COBURN LLP


By /s/ Kal K. Shah
    Kal K. Shah (*pro hac vice*)
    55 E. Monroe, 37th Floor
    Chicago, Illinois 60603
    312-580-2338
    FAX 312-580-2201
    kshah@thompsoncoburn.com

    John S. Kingston, #51403MO
    One US Bank Plaza
    St. Louis, Missouri  63101
    314-552-6000
    FAX 314-552-7000
    jkingston@thompsoncoburn.com

    *Attorneys for Defendant*
    *Abbott Laboratories, Inc.*

## CERTIFICATE OF SERVICE

      I hereby certify that on February 26, 2014, the foregoing was filed electronically with the Clerk of Court to be served by operation of the Court's electronic filing system upon all counsel of record.

      /s/ Kal K. Shah