UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| CPC LOGISTICS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 4:13-CV-00228-JCH |
| | ) |
| ABBOTT LABORATORIES, INC., | ) |
| | ) |
| Defendant. | ) |

**ABBOTT LABORATORIES, INC.'S OPPOSITION
TO PLAINTIFF'S MOTION FOR A PROTECTIVE ORDER**

**INTRODUCTION**

Abbott, not CPC, is entitled to formulate and implement its discovery strategy. CPC's motion, however, asks this Court to replace the Federal Rules with CPC's subjective whim as to what Abbott should be entitled to discover. This is patently unfair and fundamentally improper. Already, CPC has engaged in systemic obstruction of discovery by redacting non-privileged documents, refusing to produce responsive and pertinent documents and instructing deposition witnesses not to answer on relevance grounds. Furthermore, CPC's counsel has refused to provide discovery even though he unquestionably is a key fact witness as to underlying basis of this litigation (he was the central point of contact between CPC and Central States, and was responsible for determining, among other things, Abbott's allocation and apportioned share of purported liability that CPC now seeks in this case). Abbott, consequently, was left no choice but to file a motion to compel and a motion to disqualify. *See* Dkt. 48 & 49. CPC now brings a motion for protective order ostensibly to justify its discovery tactics and continue to withhold from Abbott critical facts. As explained in Abbott's motions and herein, CPC's motion is without merit.

The crux of CPC's motion is that Abbott is not entitled to the disputed discovery because, in CPC's opinion, Abbott has everything it needs to evaluate CPC's positions in this case. According to CPC, anything it has not provided but Abbott seeks is "irrelevant" and thus not discoverable. Alternatively, CPC attempts to withhold critical information based on a so-called "settlement privilege." The Federal Rules, not CPC, dictate the scope of discoverable information. Not surprisingly, CPC's motion is light on supporting case law and misconstrues the cases cited. Indeed, CPC's motion appears to be based almost entirely on the affidavit of the attorney bringing the motion (yet again acting as a fact witness).

Not only does CPC's motion fail to provide sufficient basis for the protective order sought, it further fails to explain how the existing protective order is insufficient to preserve any purported confidentiality of the information sought. *See* Dkt. 40. As explained below, each of the topics on which CPC now seeks a protective order is well within the scope of discoverable materials under applicable law and directly bears on claims or defenses in this case. Thus, because CPC's arguments are facially and substantively baseless and because this Court's existing protective order prevents any prejudice to CPC, Abbott respectfully requests that this Court reject CPC's invitation to override the Federal Rules.

**FACTUAL BACKGROUND**

This breach of contract case stems from a 1992 Service Agreement ("Agreement") between CPC's predecessor and Abbott. Generally under the Agreement, CPC provided truck drivers to Abbott for Abbott's fleet of trucks. CPC was responsible for all employment aspects of the truck drivers and invoiced Abbott weekly for services rendered. CPC thus was responsible for negotiating and managing any necessary collective bargaining agreements for the drivers. Some collective bargaining agreements required CPC to make contributions to certain pension funds on behalf of the drivers, including to the Central States Pension Fund ("Central States"). CPC invoiced Abbott for these contributions as applicable when drivers provided services at Abbott. Contrary to CPC's assertion, the Agreement does not discuss withdrawal liability and certainly does not state that "Abbott would reimburse CPC for any withdrawal liability related to those contributions." *See* CPC Br. at p. 2.

Abbott's use of CPC's services diminished over time. As a result of a 2004 corporate split by Abbott into two companies, Abbott and Hospira, Inc. ("Hospira"), Abbott retained a

mere handful of CPC truck drivers. As CPC's counsel admits, by November 2005, no Abbott drivers were part of Central States. Abbott terminated the contract with CPC in 2007.[1]

Some four years later, in 2009, CPC ceased all contributions to Central States on behalf of its drivers, effecting a "withdrawal" by CPC. As a result of the withdrawal, in April 2010 Central States assessed CPC a penalty of $9,746,204.23. The assessment, as CPC concedes, is based on complex, multifaceted actuarial calculations spanning over a decade. CPC's counsel, Michael Harris ("Harris"), in fact, was involved in numerous communications with Central States reconciling, adjusting and negotiating the terms and factors that ultimately factored into the final assessment. Harris also instructed Central States to split Abbott's purported share of liability with other customers, including Hospira. *See* Ex. A, Harris' Correspondence with Central States. Harris further told Central States that many of CPC's customers were seeking to work with Central States directly as to their share of liability. Ex. A.

CPC was well aware of withdrawal liability and was also aware that its withdrawal liability obligations were increasing over time. CPC further commissioned several independent actuarial analyses of the withdrawal liability "[i]n order to keep [CPC's] customers informed as to what the liability was." *See* Ex. B, Excerpts from Transcript of CPC's February 13, 2014 Rule 30(b)(6) Dep. at 109:5-13. CPC nevertheless waited until 2009 to withdraw from Central States. Moreover, CPC's claim for damages is a portion of the overall liability based on a mathematical allocation done by Harris with Central States.

---

[1] The parties dispute the date of termination.

The parties dispute many aspects of the above in this litigation. For starters, despite withdrawing *four years after* Abbott ceased use of any Central States drivers, CPC blames Abbott for the withdrawal. Abbott seeks discovery on CPC's financial status because Abbott contends that CPC's decision was made to increase profitability. The damages sought by CPC are a percentage of the total withdrawal liability based on two factors: the Hospira split and overall contributions made by CPC to Central States on behalf of its various customers. Abbott seeks discovery on the relevant calculations because, among other things, CPC admits that the split as to Hospira was "arbitrary" and Abbott cannot assess the accuracy of the calculations without all underlying documentation. *See* Ex. C, Central States Pension Plan, App. E at pg. 1-3.

Likewise, CPC's Interrogatory Answers state that a 2.344 multiplier was used to perform CPC's calculation, yet CPC's Rule 30(b)(6) witness and former President could not explain this multiplier. *See* Ex. D, CPC Answers to Second Interrogatories, Interrogatory No. 8 and, Ex. A, Excerpt from Transcript of CPC's February 13, 2014 Rule 30(b)(6) Dep. at 205:4-210:14. That CPC's Rule 30(b)(6) could not explain this multiplier yet CPC's counsel avers in support of the instant motion that the multiplier is all Abbott needs to know is telling, as to both this motion, and Abbott's motion to compel and disqualify as to CPC's counsel. In fact, CPC's Rule 30(b)(6) witness agreed that if he were a defendant he would want to know exactly how the multiplier was arrived at and what calculations were done. Ex. D, 209:24-210:14.

Similarly, Abbott seeks discovery of CPC's negotiations and settlement with other customers in the same pool of withdrawal liability because Abbott believes CPC's position as to the interpretation of the Agreement is inconsistent and because if CPC did improperly apportion damages, settlement by other customers directly affects the remaining liability (if any). CPC, however, refuses to provide Abbott any of this discovery. Abbott therefore moved to compel

and CPC now brings this motion for protective order. CPC's refusal is consistent with a pattern of refusing to provide relevant information and forcing Abbott devote substantial time and resources to obtaining discovery that should have been provided. CPC has improperly redacted the names of customers in its documents, failed to provide obviously relevant documents such as CPC's Board meeting minutes reflecting discussions of withdrawal liability[2] and instructed witnesses not to answer questions on grounds other than privilege. *See* Ex. E, Redacted and Unredacted Chart of CPC apportionment of liability to its customers.

CPC's motion is a continuation of these tactis, is without merit, and should be denied.

## APPLICABLE LAW

The broad scope of discovery is well established. Federal Rule of Civil Procedure 26(b)(1) provides in part:

> …the scope of discovery is as follows: Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense—including the existence, description, nature, custody, condition, and location of any documents or other tangible things and the identity and location of persons who know of any discoverable matter. … Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence.

Fed. R. Civ. Proc. 26(b)(1). "Rule 26(b) … is widely recognized as a discovery rule which is liberal in scope and interpretation, extending to those matters which are relevant and reasonably calculated to lead to the discovery of admissible evidence." *Hofer v. Mack Trucks, Inc.*, 981

---

[2] CPC has now agreed to provide its Board meeting minutes but claimed it was not previously aware Abbott was seeking such documents even though Abbott requested documents "relating to or referencing the Central States Pension Fund," "relating or relevant to the 'complete withdrawal' referenced in your Complaint," "relating or relevant to the Abbott Withdrawal Liability," and "regarding the decision to cease payments to the Central States Pension Fund."

F.2d 377, 380 (8th Cir. 1992). "A request for discovery should be considered relevant if there is any possibility that the information sought may be relevant to the subject matter of the action." *Handi-Craft Co.*, 2003 WL 26098543, at * 10 (E.D. Mo. Nov. 25, 2003).

Further, the standard of relevance for discovery purposes is broader than for admissibility purposes and "Rule 26(b) clearly states that inadmissibility is no grounds for objection to discovery…" *Hofer*, 981 F.2d 377, 380 (8th Cir. 1992). Indeed, "[t]he rules for depositions and discovery 'are to be accorded a broad and liberal treatment.'" *Credit Lyonnais, S.A. v. SGC Int'l, Inc.*, 160 F.3d 428, 430 (8th Cir. 1998). "The articulation of mere conclusory objections that something is 'overly broad, burdensome, or oppressive,' is insufficient to carry the resisting party's burden-that party must make a specific showing of reasons *why* the relevant discovery should not be had." *Signature Dev., LLC v. Mid-Continent Cas. Co.*, CIV. 11-5019-JLV, 2012 WL 4321322, * 7 (D.S.D. Sept. 18, 2012). (emphasis in original).

## ARGUMENT

### I. WITHDRAWAL LIABILITY IS AT THE HEART OF THIS CASE AND ABBOTT IS ENTITLED TO DISCOVERY ON THE UNDERLYING FACTS

The foundation of CPC's motion is that Abbott should not be entitled to the aforesaid discovery because "this is not a withdrawal liability case." *See* CPC Br. at p. 4. This is demonstrably false. This case is ***entirely*** about withdrawal liability. *See* Dkt. No. 1. Indeed, CPC alleges that the Agreement imposes upon Abbott the responsibility to reimburse CPC for withdrawal liability; Abbott disagrees. CPC's damages claim is ***wholly*** based on a calculation and split of withdrawal liability done by Harris. Withdrawal liability is at the heart of this litigation and CPC's motion seeks to prevent Abbott from discovering facts central to this matter.

Because CPC's general premise fails, so too does its request for a protective order. Fundamental fairness and justice dictate that Abbott be permitted to investigate ***all*** relevant facts

and circumstances relating to the withdrawal liability on which CPC bases its claim. Abbott further addresses each topic in CPC's motion below.

### A. Settlement Discussions Between CPC And Central States Or Other CPC Customers Are Relevant To Liability And Damages

The liability claimed is a fraction of the over $9 million in withdrawal liability incurred by CPC. CPC, however, involved some customers in early transactions with Central States, chose not to pursue others, and has aggressively pursued yet others. Moreover, CPC has resolved its dispute, and thus the corresponding allocable share, with certain customers. Abbott challenges both CPC's liability claim and damages allocation. CPC's discussions and settlements with Central States and others relate directly to Abbott's positions.

For instance, CPC's statements to other customers and negotiations weigh directly on liability. Abbott is entitled to discover what the other customer agreements say and whether CPC has interpreted them consistently with the positions it has taken here. This discovery thus bears directly on CPC's claim that withdrawal liability is included in the Agreement. *City of Wichita v. Aero Holdings, Inc.*, 192 F.R.D. 300, 301-302 (D. Kansas 2000) (affirming magistrate judge's order to turn over documents related to settlement negotiations and noting that "even matter related to settlement negotiations, although barred by Fed. R. Evid. 408 to prove liability at trial, may still be discoverable"); *American Home Assurance Co. v. Greater Omaha Packing Co., Inc.*, 2013 WL 4875997, * 3 (D. Neb. Sept. 11, 2013) (finding that "underlying facts upon which the settlement was based are not protected by the work product doctrine").

Similarly, Abbott challenges CPC's damages calculation and allocation. Abbott believes CPC improperly allocated the withdrawal liability without reference to recency of participation so as to favor current customers. Abbott thus is entitled to this discovery to determine whether CPC and Central States sought to allocate a greater portion of liability to Abbott than to current

customers, and whether CPC seeks to gain a windfall through overlapping recovery. CPC's damages claim is particularly suspect because it admits that it "arbitrarily" split Abbott's liability allocation with Hospira. Ex. B, at 250:16-22. Thus, for instance, if Hospira was provided a waiver and that waiver incorporates sums that CPC now allocates to Abbott, that would discredit and reduce CPC's damages claim. This discovery clearly is relevant. *Alliance Commc'ns Coop., Inc. v. Golden West Telecommunications Cooperative, Inc.*, No. Civ. 06-4221-KES, 2009 WL 512023, at *6 (D.S.D. Feb. 27, 2009) (holding settlement agreement must be produced because it is relevant to liability and may be used for impeachment).

As a fallback, CPC also tries to keep this evidence from Abbott by arguing that it is privileged and thus not subject to discovery pursuant to Federal Rule of Evidence 408. CPC is wrong as a matter of law. As a threshold matter, CPC has failed to establish that its communications with Central States or other customers were subject to Rule 408. There is no evidence of litigation or a "claim" as used in the Rule; these are ordinary business negotiations.

Even if those discussions were subject to Rule 408, it is well established law that "there is no federal privilege preventing the discovery of settlement agreements and related documents." *Thermal Design, Inc. v. Guardian Bldg. Products, Inc.*, 270 F.R.D. 437, 439 (E.D. Wis. 2010); *see also* Fed.R.Evid. 408; *In re General Motors Corp. Engine Interchange Litig.*, 594 F.2d at 1123–24 (recognizing no general settlement privilege); *Aero Holdings, Inc.*, 192 F.R.D. at 301-302. Indeed, Courts routinely hold that the limited settlement protection afforded by FRE 408 does not prevent third-party discovery or shield settlement materials, negotiations, or documents. *See, e.g., JZ Buckingham Invs. LLC v. United States*, 78 Fed. Cl. 15, 24 (Fed. Cl. 2007) (finding no basis to refuse discovery on the grounds that the information sought is protected under a settlement privilege); *In re General Motors Corp. Engine Interchange Litig.*, 594 F.2d at 1123-

24; *Thomas & Marker Constr. Co. v. Wal-Mart Stores, Inc.*, No. 3:06-cv-406, 2008 WL 3200642, at *3 (S.D. Ohio Aug. 6, 2008) (holding settlement agreement must be produced because "[i]t may be relevant to credibility of witnesses who may be called at trial [and] it may be relevant to any damages that may ultimately be awarded"). CPC cannot hide relevant facts by claiming they are subject to Rule 408.[3]

CPC's reliance on *Kritikos v. Palmer Johnson, Inc.*, 821 F.2d 418 (7th Cir. 1987), is misplaced. In *Kritikos*, the issue was whether settlement letters exchanged by the parties to the lawsuit were *admissible*, not whether they were *discoverable*. *Id.* at 422. CPC also relies on *ABT Systems, LLC v. Emerson Elec. Co.*, No. 4:11CV00374 AGF, 2012 WL 6594996 (E.D. Mo. Dec. 18, 2012) to support its position. *ABT Systems*, however, actually presents a compelling reason for denying CPC's motion. In *ABT Systems*, the court agreed, as a general point of law, "that settlement negotiations related to reasonable royalties and damages calculations are not protected by a settlement negotiation privilege." *Id.* at *2. There the issue was whether the defendant was entitled to settlement agreements and documents evidencing the negotiations between plaintiff and other defendants in the same case when defendant had not posited any particularized relevance to the information sought. *Id.* at *3. Yet, even then, the court agreed that admissibility is not the standard and held that the relevant settlement documents must be produced. *Id.*

---

[3] CPC's position here is further belied by the fact that this Court already has entered a comprehensive protective order than can be used to limit the scope of disclosure of such documents. *See, e.g., Board of Trustees of the Leland Stanford Junior Univ. v. Tyco, Int'l Ltd.*, 253 F.R.D. 521, 523 (C.D. Cal. 2008) (collecting cases); *Thomas & Marker Constr. Co.*, 2008 WL 3200642, at *3.

### B. CPC's Efforts To Recoup Withdrawal Liability From Others Is Relevant To Both Liability And Damages.

Abbott also seeks discovery as to CPC's efforts to recover the withdrawal liability from current and former customers. This is relevant on many fronts.

First, it relates to liability insofar as it shows how CPC interpreted other customer contracts. Contrary to CPC's assertion, the Agreement does not expressly include withdrawal liability (unlike other CPC contracts that do expressly address withdrawal liability, which CPC also initially refused to produce). Thus, CPC's interpretation of other customer contracts may be telling of their claim here. Indeed, before CPC began instructing its witnesses not to answer on relevance grounds, Abbott learned that CPC capped liability for at least one CPC customer based on the explicit withdrawal liability language in that contract. Ex. B, at 171:7-178:1. Abbott is entitled to probe this further with respect to at least those customers allegedly subject to the same withdrawal liability pool at issue. *Aero Holdings, Inc.*, 192 F.R.D. at 301; *American Home Assurance Co.*, 2013 WL 4875997, * 3; *In re General Motors Corp. Engine Interchange Litig.*, 594 F.2d at 1123-24; *Thomas & Marker Constr. Co.*, 2008 WL 3200642, at *3.

Second, this also impacts damages as Abbott is entitled to determine whether CPC is double-dipping in its collection attempts in an effort to maximize profit. This information, again, falls well within the broad scope or Rule 26. CPC's recoupment efforts are relevant to show if CPC is being consistent in how it allocated withdrawal liability. CPC has already disclosed some inconsistency in its practices by revealing that it sued several former customers, settled with some current customers and decided to forego collection efforts altogether against others. Even more troubling is the fact that John Bickel testified that the allocation of withdrawal liability between Hospira and Abbott was "arbitrary." Ex. B, at 250:16-22. In light of this

testimony, Abbott deserves an opportunity to investigate CPC's efforts and positions taken as part of its recoupment strategy.

Furthermore, CPC's decision to recoup withdrawal liability among certain customers and not others also raises credibility issues. For example, if all the agreements are the same or similar but CPC chose not to pursue current customers or gave them a break (further making settlement discussions relevant), this would weigh on the credibility of CPC's claim that the Abbott contract includes withdrawal liability. Indeed, this topic goes directly to: (i) whether CPC is penalizing those customers no longer doing business with CPC; (ii) whether CPC is "double dipping" on its collection efforts; (iii) why CPC decided to forego collection from certain customers and agreed to accept less than the allocable share from others; and (iv) the amount of the total withdrawal liability CPC has recouped. This information is well within the broad scope of Rule 26.

> **C. CPC'S Financial Status And Profitability Relate Directly To CPC's Claim That Abbott Caused CPC To Incur Withdrawal Liability**

CPC withdrew from Central States in 2009, ***more than four years*** after Abbott ceased using CPC's Central States based drivers. Yet, CPC has repeatedly blamed Abbott for its withdrawal. Abbott thus sought discovery on CPC's financial status, performance and profitability from at least 2000 to 2010 to assess the credibility of CPC's claim that Abbott's reduced use of CPC's services caused the withdrawal. CPC, amazingly, has steadfastly refused to provide this information. CPC now seeks a protective order to effectively use this Court as a tool to make CPC's allegation of blame unchallengeable. This is improper.

Abbott sought the basis for CPC's withdrawal in 2009 and CPC responded:

> …the decision to cease contributions to Central States on behalf of drivers assigned by CPC to each of the Abbott locations at which drivers were covered by Central States, in each instance, ***was made by Abbott as a direct result of Abbott's cancellation of these***

- 11 -

> *locations*. The decision to cease contributions to Central States on behalf of drivers assigned by CPC to certain other customer locations at which drivers were covered by Central States was made by CPC's customer.

*See* Ex. F, CPC's First Amended Answer to Interrogatory No. 6. (emphasis added). This is not credible and Abbott sought to challenge CPC's claim through, among other things, information related to CPC's financial status and profitability during the relevant period. Obviously, if CPC was financially sound and profitable, Abbott is not to blame. Moreover, if CPC's profits increased after the withdrawal, it supports Abbott's position that CPC's decision to withdraw in 2009 was purely for profit and it now seeks to use Abbott as a scapegoat.

Abbott is also entitled to CPC's financial documents to determine whether there is any objective evidence that CPC anticipated its customers repaying withdrawal liability. Abbott is entitled to know whether CPC reported contingent withdrawal liability in its financial reports and whether it indicated that customers would pay this amount. If neither of these line items appears in CPC's financial statements, this would tend to show that CPC did not anticipate repayment from its customers for withdrawal liability. If CPC did not anticipate repayment, that supports Abbott's view that the parties never intended to include withdrawal liability in the Agreement.

### D. Information Regarding CPC's Contributions To Other Pension Funds Subject To Withdrawal Liability Is Discoverable[4]

As discussed above, Abbott believes CPC's withdrawal in 2009 has nothing to do with Abbott, but rather is a general shift by CPC away from using union drivers with withdrawal liability exposure in favor of greater profit. Abbott also believes that any decision by CPC to

---

[4] Abbott does not believe that CPC met the required meet and confer obligations as to this topic. However, because it is in CPC's motion, Abbott addresses it on the merits.

cease doing business with pension funds is indicative of the fact that withdrawal liability is not a routine pass-through cost that can be forced upon its customers. Thus, Abbott's Interrogatory No. 18 requested information related to whether and to what extent CPC continued to employ drivers enrolled in pension funds that are subject to withdrawal liability. Again, this goes to credibility as well as CPC's interpretation of the Agreement and, ultimately, liability. Moreover, it is not a difficult inquiry. Either CPC no longer hires drivers that participate in such funds, or they do in which case they can list the funds and number of drivers in each.

This relates directly to CPC's claim that Abbott was the reason CPC had to withdraw. If, as Abbott suspects, CPC ceased or began systematically reducing such contributions, this also weighs on the credibility of CPC's claim that Abbott was responsible for CPC's withdrawal.

### E. CPC'S Actuarial Analyses Are Discoverable And Are Not Attorney Work Product.

CPC's document production revealed that from at least 2006, CPC sought assistance of an actuary to assess potential withdrawal liability. Abbott sought discovery of these analyses because they relate to, among other things, CPC's knowledge and efforts to mitigate damages. CPC has refused to produce such documents claiming they are not relevant and, moreover, constitute attorney work-product. CPC's arguments are misplaced.

First, the materials are not privileged as CPC testified the actuarial analyses were created in the ordinary course of its business. Specifically, during its 30(b)(6) deposition, CPC stated:

> Q. And CPC actively kept tabs on what the liability would be should it withdraw at various times; isn't that fair?
> A. Yes.
> Q. And why did CPC do that? Why was CPC monitoring what the withdrawal liability would be over time?
> A. In order to keep our customers informed as to what the liability was.

Ex. B, at 109:5-13. Indeed, these calculations were the subject of letters sent to Abbott well before any litigation. *See* Ex. G, January 8, 2008 Letter from CPC to Abbott. This evidence makes clear that these analyses were not done for legal purposes, let alone at the instruction and under the supervision of counsel in anticipation of litigation.

Second, the work product doctrine is inapplicable since the doctrine is intended to protect "a lawyer's mental impressions." *See In re Murphy*, 560 F.2d 326, 334 (8th Cir. 1977) (holding "[t]he primary purpose of the work product privilege is to assure that an attorney is not inhibited in his representation of his client by the fear that his files will be open to scrutiny upon demand of an opposing party."). "The critical inquiry in determining whether material is protected by the work-product doctrine is whether the material was 'prepared by an attorney acting for his client in anticipation of litigation.'" *Cottillion v. United Ref. Co.*, 279 F.R.D. 290, 302 (W.D. Pa. 2011). The work product doctrine only protects documents prepared in anticipation of litigation. *Simon v. G.D. Searle & Co.*, 816 F.2d 397, 401 (8th Cir. 1987). The Eighth Circuit is clear that "even though litigation is already in prospect, there is no work product immunity for documents prepared in the regular course of business rather than for purposes of litigation." *Id.* (emphasis added). "Materials assembled in the ordinary course of business … or for other nonlitigation purposes are not under the qualified immunity provided by this subdivision." *Id.* The *Simon* court held that risk management documents were not protected because, among other things, "the risk management department was not involved in giving legal advice or in mapping litigation strategy in any individual case." *Id.*

"A litigant must demonstrate that documents were created 'with a specific claim supported by concrete facts which would likely lead to litigation in mind,' not merely assembled in the ordinary course of business or for other nonlitigation purposes." *Linde Thomson*

*Langworthy Kohn & Van Dyke, P.C. v. Resolution Trust Corp.*, 5 F.3d 1508, 1515 (D.C. Cir. 1993). CPC failed to make any showing beyond its counsel's bare conclusion that the actuarial analyses conducted by CPC in 2006 and 2007 were prepared in anticipation of litigation against Abbott in 2013. Indeed, CPC's affidavit provides no facts suggesting the analyses were prepared in anticipation of litigation aside from Abbott's belief that it was not liable.

Furthermore, Courts have rejected work product claims related to actuarial analyses because many companies prepare them in the ordinary course of business. *See, e.g., Cottillion*, 279 F.R.D. 290, 302 (W.D. Pa. 2011) (holding actuarial analysis not protected by work product where it appeared to have been prepared in the ordinary course of business); *Fleisher v. Phoenix Life Ins. Co.*, 2013 WL 42374, * 4 (S.D.N.Y. Jan. 3, 2013) (holding that defendant had given "no basis for differentiating between those documents that might be related to its legal concerns and those that are business-oriented" and compelling production of actuarial analysis). Based on well-settled law and CPC's own testimony, the actuarial analyses here are not protected by the work product doctrine and should be produced.

Moreover, a party waives work product privilege when it files a motion for protective order without providing a privilege log. *St. Paul Reinsurance Co., Ltd. v. Commercial Fin. Corp.*, 197 F.R.D. 620, 641 (N.D. Iowa 2000) (finding party waived work product privilege by failing to assert it in a timely and effective manner). In the instant case, CPC failed to provide any privilege log to Abbott prior to bringing its motion and therefore waived any protection.

### CONCLUSION

WHEREFORE, Defendant Abbott Laboratories, Inc. respectfully requests that this Court deny CPC's Motion for Protective Order in its entirety and grant any additional appropriate relief.

March 7, 2014                     Respectfully submitted,

THOMPSON COBURN LLP


By /s/ Kal K. Shah
    Kal K. Shah (*pro hac vice*)
    55 E. Monroe, 37th Floor
    Chicago, Illinois 60603
    312-580-2338
    FAX 312-580-2201
    kshah@thompsoncoburn.com

    John S. Kingston, #51403MO
    One US Bank Plaza
    St. Louis, Missouri 63101
    314-552-6000
    FAX 314-552-7000
    jkingston@thompsoncoburn.com

    *Attorneys for Defendant*
    *Abbott Laboratories, Inc.*

## CERTIFICATE OF SERVICE

  I hereby certify that on March 7, 2014, the foregoing was filed electronically with the Clerk of Court to be served by operation of the Court's electronic filing system upon all counsel of record.

                  /s/ Kal K. Shah