UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| CPC LOGISTICS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 13-cv-00228 |
| v. | ) | |
| | ) | Judge Jean C. Hamilton |
| ABBOTT LABORATORIES, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM IN SUPPORT OF DEFENDANT ABBOTT LABORATORIES, INC.'S
MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

Page

INTRODUCTION .................................................................................................................. 1

STATEMENT OF FACTS .................................................................................................... 2

    The 1992 Agreement And Schedule A ............................................................................. 2

    The Addition Of Union Drivers And Subsequent Schedules A ....................................... 4

    The Parties' Post-Contract Discussions, Or Lack Thereof, Regarding Withdrawal
        Liability ................................................................................................................ 6

    Abbott's Reduction Of CPC's Services And The Termination Of The Parties'
        Agreement ............................................................................................................ 7

    CPC Decides To Withdraw From Central States.............................................................. 7

    CPC's Lawsuit Against Other Customers ........................................................................ 8

    CPC's Claim Against Abbott............................................................................................ 9

APPLICABLE LEGAL STANDARD ................................................................................. 10

ARGUMENT ....................................................................................................................... 10

    I.       ABBOTT AND CPC HAD NO CONTRACTUAL RELATIONSHIP
            WHEN THE ALLEGED BREACH OCCURRED ............................................. 10

    II.      THE UNAMBIGUOUS LANGUAGE OF THE AGREEMENT DOES
            NOT INCLUDE WITHDRAWAL LIABILITY .................................................. 12

           A.      As CPC Concedes, Withdrawal Liability Is Not Included In The
                  Plain Language Of The Agreement ........................................................ 12

           B.      Withdrawal Liability Does Not Fall Within Paragraphs A, B Or C
                  Of The April 2002 Schedule A .............................................................. 13

    III.    CPC CANNOT PROVE THE PARTIES INTENDED TO INCLUDE
            WITHDRAWAL LIABILITY IN THE APRIL 2002 SCHEDULE A ............... 16

CONCLUSION..................................................................................................................... 20

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Anderson v. Liberty Lobby, Inc.,*
477 U.S. 242 (1986)............................................................................................10

*Bay Area Laundry & Dry Cleaning Pension Trust Fund v. Ferbar Corp. of Cal., Inc.,*
522 U.S. 192 (1997)............................................................................................12

*Busch & Latta Painting Corp. v. State Highway Comm'n,*
597 S.W.2d 189 (Mo. Ct. App. 1980)................................................................16

*Care Ctr. of Kan. City v. Horton,*
173 S.W.3d 353 (Mo. Ct. App. 2005)................................................................14

*Carpenters Pension Trust Fund for N. Cal. v. Moxley,*
734 F.3d 864 (9th Cir. 2013) ......................................................................13, 15

*Celotex Corp. v. Catrett,*
477 U.S. 317 (1986)............................................................................................10

*Clean Unif. Co. St. Louis v. Magic Touch Cleaning, Inc.,*
300 S.W.3d 602 (Mo. Ct. App. 2009)................................................................15

*Connors v. B&W Coal Co.,*
646 F. Supp. 164 (D.D.C. 1986) (29 U.S.C. § 1392(a) ......................................15

*Debrecini v. Healthco-D.G. Stoughton Co.,*
579 F. Supp. 296 (D. Mass. 1984) .....................................................................16

*Farm Bureau Town & Country Ins. of Mo. v. Hilderbrand,*
926 S.W.2d 944 (Mo. Ct. App. 1996)................................................................14

*Mark Twain Bank v. Cont'l Bank, N.A.,*
817 F. Supp. 792 (E.D. Mo. 1993)....................................................................16

*McCormack v. Citibank, N.A.,*
100 F.3d 532 (8th Cir. 1996) ..............................................................................14

*Mo. Consol. Health Care Plan v. Blue Cross Blue Shield of Mo.,*
985 S.W.2d 903 (Mo. Ct. App. 1999)................................................................19

*R-Way Furniture Co. v. Powers Interiors, Inc.,*
456 S.W.2d 632 (Mo. Ct. App. 1970)................................................................18

*Retail Ventures, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh,*
691 F.3d 821 (6th Cir. 2012) ..............................................................................15

ii

*Shaub & Williams, L.L.P. v. Augme Techs., Inc.*,
    2014 U.S. Dist. LEXIS 23917 (S.D.N.Y. Feb. 14, 2014)......................................................11

*Specialty Rests. Corp. v. Gaebler*, 956 S.W.2d 391 (Mo. Ct. App. 1997) ...................................19

*Superior Pocahontas v. Island Creek,*
    656 F. Supp. 796 (S.D. W. Va. 1987), *aff'd* 840 F.2d 11 (4th Cir. 1988) .............................16

*Transpersonnel, Inc. v. Roadway Express, Inc.*,
    422 F.3d 456 (7th Cir. 2005) ................................................................................19

*Watkins v. GMAC Fin. Servs.*,
    337 Ill. App. 3d 58, 785 N.E.2d 40 (2003) ..........................................................18

*White v. Pruiett,*
    39 S.W.3d 857 (Mo. Ct. App. 2001)................................................................10, 11

## STATUTES

29 U.S.C. §1381, *et seq.*..........................................................................1, 13, 14

29 U.S.C. §1392........................................................................................15

29 USC § 1383........................................................................................12

## OTHER AUTHORITIES

Fed. R. Civ. P. 56........................................................................................10

L. R. 4.01(E) ...............................................................................................2

Fed. R. Civ. P. 30(b)(6)............................................................................9, 13

**INTRODUCTION**

This breach of contract case stems from a two-decade old agreement between Defendant Abbott Laboratories, Inc. ("Abbott") and TLI, Incorporated ("TLI"), the predecessor of Plaintiff CPC Logistics, Inc. ("CPC").  CPC contends that Abbott agreed at some point under this contract to reimburse CPC in the event CPC incurred pension fund withdrawal liability.[1] The timing of Abbott's alleged breach, the plain language of the parties' contract, CPC's own binding admissions, and the undisputed history of the parties' relationship, however, each leaves no doubt that Abbott bore no responsibility for CPC's withdrawal liability. To that end, the parties do not dispute any material fact but rather only the legal import of the facts.  Abbott moves for summary judgment on three independent grounds.

*First*, CPC has not and cannot establish a valid and enforceable contract.  CPC asserts breach of a 1992 Agreement and corresponding Schedule A.  That Agreement and Schedule A, the parties agree, was terminated by at least November 27, 2009.  CPC's claimed breach is predicated solely on Abbott's failure to reimburse CPC for invoices from September 2010 and later.  But by that time, the parties' relationship was long since over and Abbott had ***no*** contractual obligation to CPC.  In short, there was no contract and thus there can be no breach.

*Second*, even if the parties' contract was in force at the time of the alleged breach, the plain language does not provide for reimbursement of withdrawal liability. Under the Agreement, Abbott was to reimburse CPC only for "services rendered."  CPC admits, however, that withdrawal liability ***is not*** for services rendered, leaving no issue of fact.  Indeed, withdrawal

---

[1] Pension fund withdrawal liability is a penalty assessed against employer-participants, like CPC, in multi-employer pension funds after the employer ceases to make contributions to—and thus withdraws from—the fund. The purpose of withdrawal liability is to make up a portion of the fund's lost, ***future*** contributions, and arises only where the pension fund has unfunded vested benefits, referred to as "UVB", in the calendar year immediately preceding the effective date of withdrawal.  *See* 29 U.S.C. §1381 *et seq*.

liability is a penalty for the pension fund's *future* shortfall. As a matter of law, the language of the parties' contract does not cover withdrawal liability.

*Third*, and finally, the extrinsic evidence is consistent with Abbott's position.  On this score, the parties again agree that withdrawal liability was not and could not have been contemplated when the contract was initially executed.  CPC thus must demonstrate that the parties later agreed to include withdrawal liability as part of the contract scope.  It cannot do so. There is no evidence that the parties discussed or negotiated withdrawal liability as part of any subsequent Schedule A, including when CPC began supplying union drivers to Abbott.  Because withdrawal liability undisputedly *was not* part of the original agreement and because CPC cannot demonstrate that the parties mutually intended to include withdrawal liability at some later point, CPC cannot establish a contractual obligation by Abbott for withdrawal liability.

Abbott respectfully submits that the evidence and law overwhelmingly support each of its three arguments.  If this Court agrees with Abbott even as to just one of these positions, summary judgment in favor of Abbott is warranted.

## STATEMENT OF FACTS

### The 1992 Agreement And Schedule A

Abbott is a healthcare products company with several manufacturing operations located throughout the country.  (SF, ¶ 1.)[2]  Historically, Abbott owned or leased its own trucks and used drivers to deliver its products within operation sites and to healthcare facilities. (SF, ¶ 2.) During the period in question, Abbott did not employ truck drivers; rather, it contracted with driver leasing companies, such as TLI, to provide drivers.  (SF, ¶ 3.) The driver leasing companies

---

[2] "SF" refers to Abbott's Statement of Uncontroverted Material Facts, filed contemporaneously with Abbott's Motion and Memorandum in Support of Summary Judgment, pursuant to E.D.Mo. L. R. 4.01(E).  Because Abbott restates the most pertinent uncontroverted material facts in this Memorandum, Abbott moved previously for leave to file this Memorandum in excess of the fifteen (15) page limitation set by local rule.  (Dkt. No. 100.)  If denied, Abbott will file a revised Memorandum in compliance with the Court's order.

employed the drivers and managed every aspect of their employment, including hiring, training, wages, payroll, and benefits. (SF, ¶ 5.) In the case of union drivers, the leasing company also was responsible for the negotiation and management of any applicable collective bargaining agreements.  (SF, ¶ 5.)  Abbott thus was able to focus on its core business, and the leasing companies provided a mechanism for control and certainty in transportation costs.  (SF, ¶ 4.)

On or about February 1, 1992, Abbott and CPC's predecessor, TLI, entered into a contract for the supply of a single non-union driver to Abbott's Kansas City facility (the "Agreement").  (SF, ¶ 7.)  The Agreement required TLI, *inter alia,* to provide Abbott with licensed drivers, pay all wages and benefits due to the drivers, pay all applicable taxes, and bear sole responsibility for all labor negotiations and related items concerning drivers furnished to Abbott under the Agreement. (SF, ¶ 8.) Abbott agreed, *inter alia,* to pay TLI for the services provided in accordance with the Schedules attached to the Agreement, for which TLI would invoice Abbott on a weekly basis.  (SF, ¶ 9.)

The Agreement included an original Schedule A, also dated February 1, 1992 ("1992 Schedule A"), that identified the specific payments "for services rendered" for which Abbott, the "CUSTOMER", would reimburse TLI, the "CONTRACTOR".  (SF, ¶ 13, 15-16.) These payments included:

> A.)     The amount of wages, fringe benefits and other payment required to be made by CUSTOMER (sic) [3] under the Agreement, including all payments made to or for the benefit of the employees supplied under Agreement pursuant to any agreement, statute or governmental regulation.

> B.)     It is understood and agreed that if, during the effective term of this Agreement, CONTRACTOR is required to increase such payroll cost as a result of the determination of any governmental authority, then CUSTOMER will reimburse CONTRACTOR for such increases, at cost.

---

[3] The parties agree that this is a typographical error that should have said "CONTRACTOR", not "CUSTOMER". (SF, ¶ 17.)

C.)     CUSTOMER also agrees to reimburse CONTRACTOR for employees'
holiday and vacation pay and health insurance together with any other employee
benefits paid for or in behalf (sic) such employees as a result of mutual
agreement.[4]

*        *        *

(SF, ¶ 16.)  Both the Agreement and 1992 Schedule A were form documents drafted by TLI (SF,

¶ 14), and neither mentions "withdrawal liability."   (SF, ¶ 19.) It is further undisputed that

withdrawal liability was not discussed nor contemplated as part of the Agreement or 1992

Schedule A. (SF, ¶ 20-22, 24.)

TLI subsequently reorganized into CPC, and CPC assumed the Agreement, including the

1992 Schedule A, in February 1997. (SF, ¶ 25.)

**The Addition Of Union Drivers And Subsequent Schedules A**

In the mid-1990s, Abbott began using CPC drivers for additional locations.  With the

addition of new locations or changes in the service charge, CPC apparently would provide a

revised Schedule A.  (SF, ¶ 26.) CPC also began providing union drivers to service the Abbott

account in the mid-1990s. (SF, ¶ 27.) For those drivers, CPC managed all labor union

responsibilities, including negotiating collective bargaining agreements and making pension

contributions.  (SF, ¶ 28.) Some of the collective bargaining agreements required CPC to make

pension fund contributions to the Central States, Southeast and Southwest Areas Pension Fund

("Central States").  (SF, ¶ 29.)

In April 2002, CPC and Abbott entered into a subsequent Schedule A (the "April 2002

Schedule A") that covered all of the locations for which CPC supplied drivers to Abbott. (SF, ¶

30.)  It is on the April 2002 Schedule A that CPC relies to support its breach of contract claim.

(SF, ¶ 32.)  Like the Agreement and prior schedules A, the April 2002 Schedule A was a form

---

[4] Abbott includes only paragraphs A, B and C because those are the only paragraphs on which CPC purports to rely
to support its breach of contract claim. (SF, ¶ 33.)

Schedule A prepared by CPC.  (SF, ¶ 31.) The language of the April 2002 Schedule A differed slightly from that of the original 1992 Schedule A in that it included payments for services rendered that CPC made pursuant to collective bargaining agreements, specifically, pension fund contributions:

> A.)     The amount of wages, fringe benefits and other payment required to be made by CUSTOMER (sic)[5] under the Agreement, or ***pursuant to any collective bargaining agreement***, statute or governmental regulation, including, but not limited to, all payments made to, for the benefit of or in any manner relating to the personnel supplied under the Agreement.
>
> \*          \*          \*
>
> C.)     CUSTOMER also agrees to reimburse CONTRACTOR holiday and vacation pay and health, welfare and ***pension fund contributions*** applicable to or required with respect to the employees provided hereunder, together with any other employee benefits paid for, in behalf of or in any other manner relating to such employees as a result of or in any manner relating to a union agreement obligation.
>
> \*          \*          \*

(SF, ¶ 34-35, emphasis added.)[6]  The April 2002 Schedule A makes no mention of withdrawal liability, and the CPC employee who executed the April 2002 Schedule A—its then Vice President—admits that withdrawal liability was not discussed in connection with the April 2002 Schedule A.[7] (SF, ¶ 39.)  CPC's corporate representative also admitted that withdrawal liability was not "for services rendered". (SF, ¶ 40.)

In addition to the Schedules A, the parties also periodically executed Addenda, which identified the specific amounts of wages and benefits for which Abbott would be responsible under the governing schedule A. (SF, ¶ 47.)  An Addendum, for example, identified the effective

---

[5] The parties again agree that this should have said "CONTRACTOR", not "CUSTOMER". (SF, ¶ 38.)

[6] Paragraph B of the 2002 Schedule A was materially identical to that in the 1992 Schedule A. (SF, ¶ 35.)

[7] The collective bargaining agreement and pension fund contribution language was first added to a schedule A between the parties in 1997.  (SF, ¶ 36.)  CPC admits that there were no discussions about withdrawal liability when this language was originally added.  (SF, ¶ 37.)

hourly wage rate; tax rates for social security, federal and state unemployment, and workers compensation; holiday and vacation rates; health and welfare and pension contribution amounts per week; and sick pay rates. (SF, ¶ 48.) The parties executed their last Addendum in January 2006. (SF, ¶ 49.) None of the Addenda mention withdrawal liability. (SF, ¶ 50.)

**The Parties' Post-Contract Discussions, Or Lack Thereof, Regarding Withdrawal Liability**

At the time of negotiation and execution of the Agreement and 1992 Schedule A, CPC admits that the parties neither discussed nor contemplated withdrawal liability as part of their contract. (SF, ¶ 20-22, 24.) CPC also concedes that there is no evidence that the parties negotiated or even discussed withdrawal liability in connection with any other Schedule A, including when CPC began supplying union drivers to provide services for Abbott in the mid-1990s or when the parties executed the April 2002 Schedule A. (SF, ¶ 37, 39, 46.)

Indeed, the only discussions alleged or evidenced regarding withdrawal liability did not occur until nearly a decade after execution of the Agreement and were not in the context of any negotiations with respect to any Schedule A.  CPC alleges that its employee, Daniel Moroski, raised withdrawal liability by telephone with an Abbott employee, Ralph Terry, in or around April 2001. (SF, ¶ 53.)  Mr. Terry has no recollection of such discussion, and Mr. Moroski could not provide specifics of what the parties allegedly discussed. (SF, ¶ 53-54.)   The first corroborated evidence of a discussion between the parties regarding withdrawal liability is from 2003, when Abbott considered terminating CPC drivers at its Rocky Mount, North Carolina location. (SF, ¶ 55.)  Specifically, CPC sought to persuade Abbott not to cancel CPC's services by claiming it might lead to withdrawal liability. In June 2003, Ralph Terry of Abbott forwarded to CPC's Vice President a communication from Abbott's legal counsel making clear that

withdrawal liability was not Abbott's liability under the Agreement nor was it in any way included in the Agreement. (SF, ¶ 59.)

Despite Abbott's unequivocal response, CPC never sought to amend the language of the April 2002 Schedule A. Instead, CPC proceeded to execute subsequent, identically worded Schedules A.   (SF, ¶ 60, 45.)  At no time did Abbott agree that withdrawal liability was part of the Agreement, including any Schedule A, regardless of when any such discussion arose. (SF, ¶ 57, 59, 61.)

**Abbott's Reduction Of CPC's Services And The Termination Of The Parties' Agreement**

In 2004, as a result of a spin-off by Abbott, Abbott largely ceased using CPC drivers. (SF, ¶ 62.)   Abbott's need for CPC drivers was reduced significantly and the last pension fund contribution made by CPC to Central States for a driver providing services to Abbott was in 2005. (SF, ¶ 64-66.)  After 2005, Abbott used CPC for only a handful of non-Central States drivers, and, ultimately, Abbott determined it no longer needed CPC's services.  (SF, ¶ 64-65.)

In June 2007, Abbott sent CPC notice of termination of the Agreement, at least as to all of its locations that used union drivers.[8]  (SF, ¶ 67.)  In July 2007, Abbott informed CPC of its intent to continue using CPC drivers at a single non-union location in Texas. (SF, ¶ 67.)  On October 28, 2009, Abbott notified CPC of its intent to terminate that final location, effective thirty days thereafter.  (SF, ¶ 68.)  The parties agree that the Agreement and any Schedules A between Abbott and CPC terminated entirely no later than November 27, 2009. (SF, ¶ 68.)

**CPC Decides To Withdraw From Central States**

CPC knew as early as 1995 that Central States was underfunded. (SF, ¶ 69-70.) In fact, in 1995, 2001, 2002, 2003 and 2004, CPC requested and received from Central States the amount

---

[8] Abbott believes this termination effectively terminated the entire Agreement; however, for purposes of summary judgment only, Abbott assumes the complete termination date alleged by CPC—November 27, 2009.

of withdrawal liability that CPC, as the employer, would incur if it withdrew from Central States in each of those years.  (SF, ¶ 70.) The amount increased with each passing year. For example, Central States informed CPC that a withdrawal in 2001 would yield withdrawal liability of $642,080.62, and that a withdrawal in 2003 would yield withdrawal liability of $2,271,573.47, almost four times the amount just two years prior. (SF, ¶ 71.) CPC did not share these communications with Abbott. (SF, ¶ 72.)

In 2009, CPC unilaterally determined that it was in its best interest to withdraw from Central States—without consulting with or notifying Abbott.  (SF, ¶ 73-75.) Accordingly, on December 1, 2009, CPC voluntarily ceased making pension fund contributions to Central States for any of its drivers and thereby, by law, completely withdrew from the pension fund. (SF, ¶ 73.)   Four months later, on April 21, 2010, Central States assessed withdrawal liability against CPC as a result of its withdrawal.  (SF, ¶ 76.) CPC disputed the initial assessment and worked with Central States for the next six months to reach a final assessment of $9,746,204.23 on October 18, 2010. (SF, ¶ 76.)  In the interim, on or about September 3, 2010, CPC sent Abbott an initial invoice for reimbursement of a portion of the withdrawal liability. (SF, ¶ 77.)

**CPC's Lawsuit Against Other Customers**

Before suing Abbott for a portion of its withdrawal liability, CPC brought suit against at least one other of its customers, International Paper Company, which was previously before this Court. (SF, ¶ 80.)  Although both cases involve withdrawal liability, they materially differ, and those differences make summary judgment appropriate here.  For example, International Paper, unlike Abbott, was still a CPC customer when CPC withdrew from Central States and even remains a customer today. (SF, ¶ 81.)  CPC notified International Paper of its intent to withdraw. (SF, ¶ 74.)  In addition, the Schedules A at issue in both cases are materially different. The CPC-

8

International Paper Schedule A required International Paper to pay for "CPC's charges plus a fee" (SF, ¶ 82), whereas the CPC-Abbott Schedules A, as noted, limited Abbott's obligations to certain payments only "for services rendered." Finally, International Paper was responsible for the language in its Schedules A whereas CPC drafted the language in the Abbott Schedules A. (SF, ¶ 83.) In short, any findings made by the Court in that prior case are irrelevant and inapplicable to this dispute.

**CPC's Claim Against Abbott**

In its Complaint, CPC alleges a single count for breach of contract. Specifically, CPC asserts that the 1992 Agreement and April 2002 Schedule A constitute a valid and enforceable contract, that the Agreement and April 2002 Schedule A require Abbott to reimburse CPC for a portion of CPC's incurred withdrawal liability, and that Abbott has failed and refused to reimburse CPC for a portion of CPC's withdrawal liability. (SF, ¶ 85.) In discovery, CPC further specified that "Abbott breached the agreement by failing and refusing to reimburse CPC within ten (10) days of receipt of CPC's invoices relating to withdrawal liability, including but not limited to invoices dated September 3, 2010...and all invoices submitted subsequently." (SF, ¶ 86.) CPC confirmed, through its Rule 30(b)(6) corporate representative, John Bickel, the limited nature of its claim:

> Q.    What is the breach that CPC asserts by Abbott?
>
> A.    They failed to pay our invoices for withdrawal liability.
>
>        \*    \*    \*
>
> Q.    And just so the record is clear, am I correct that it's CPC's view that Abbott breached the contract at the time that CPC invoiced it for withdrawal liability and Abbott failed to pay?
>
> A.    Yes.
>
> Q.    Is there any other grounds for breach that CPC asserts against Abbott?

       A.     No.

(SF, ¶ 87.)  For the reasons explained below, CPC cannot succeed on this claim at trial and summary judgment for Abbott is therefore proper.

## APPLICABLE LEGAL STANDARD

The Court may grant a motion for summary judgment if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); *see also* Fed. R. Civ. P. 56(a). Once the moving party informs the Court of the basis of its summary judgment motion, the nonmoving party must set forth specific facts demonstrating that there is a dispute as to a genuine issue of material fact, not the "mere existence of some alleged factual dispute." Fed. R. Civ. P. 56(e); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247 (1986). Rule 56 requires entry of summary judgment against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322.

## ARGUMENT

## I.    ABBOTT AND CPC HAD NO CONTRACTUAL RELATIONSHIP WHEN THE ALLEGED BREACH OCCURRED.

The lone premise of CPC's breach of contract count is that Abbott failed to pay invoices from September 2010 onward. But these invoices were submitted almost a year after the Agreement was terminated on November 27, 2009.  Consequently, summary judgment is proper because there was no contract between Abbott and CPC at the time of the alleged breach.  *See White v. Pruiett,* 39 S.W.3d 857, 861 (Mo. Ct. App. 2001) (breach of contract claim requires an ***existing*** contract between the parties).

For purposes of summary judgment, the following material facts are undisputed:

- The Agreement, including any applicable Schedule A, was terminated in its entirety as of **November 27, 2009** (SF, ¶ 68);

- CPC unilaterally withdrew from Central States on **December 1, 2009**  (SF, ¶ 73);

- CPC was initially assessed withdrawal liability by Central States in **April 2010** (SF, ¶ 76);

- CPC first invoiced Abbott for a portion of its purported share of CPC's withdrawal liability in **September 2010** (SF, ¶ 77); and

- Central States sent to CPC the final assessment of withdrawal liability on **October 18, 2010** (SF, ¶ 76).

These facts unequivocally establish that CPC cannot meet its burden of demonstrating a valid and enforceable contract in existence ***at the time of the alleged breach***. *See White*, 39 S.W.3d at 861; *see also Shaub & Williams, L.L.P. v. Augme Techs., Inc.*, 2014 U.S. Dist. LEXIS 23917, *22, n. 6 (S.D.N.Y. Feb. 14, 2014) ("a claim for breach of contract may not be made based on an alleged breach that occurred . . .  after the contract was terminated and therefore no longer in existence").  Specifically, CPC was clear that the only alleged breach by Abbott was Abbott's failure to pay invoices submitted by CPC as of September 2010.[9]  (SF, ¶ 86-87.)  But CPC concedes that the Agreement was terminated some ten months earlier on November 27, 2009. (SF, ¶ 68.)  There was no contract between the parties at the time of the September 2010 invoice, and thus Abbott could not be in breach.

CPC, no doubt, will try to recast its argument based on when it accrued the liability, not the invoice.  It is too late for such a change, but, even if permitted, CPC fares no better.  CPC's Complaint and its expert are clear that the withdrawal liability at issue could not accrue as to CPC until December 1, 2009—when CPC chose on its own to withdraw from Central States

---

[9] CPC's invoice of September 2010 itself was premature as CPC had not yet been presented with Central States' final assessment.  It was not until October 18, 2010 that Central States finalized its assessment against CPC and even later that CPC actually paid. (SF, ¶ 76, 78.)

(*four years after* Abbott had ceased using any CPC driver in Central States). (SF, ¶ 73, 89); *see also Bay Area Laundry & Dry Cleaning Pension Trust Fund v. Ferbar Corp. of Cal., Inc.*, 522 U.S. 192, 196 (1997) (*citing* 29 USC § 1383(a)) (an employer incurs withdrawal liability when it effectuates a "complete withdrawal" from the plan, and a "complete withdrawal" occurs when the employer "permanently ceases to have an obligation to contribute under the plan"). Abbott believes this date is too early because: (1) the Agreement did not require Abbott to reimburse CPC for any payments owed until it was invoiced (SF, ¶ 10); and (2) it was not until at least April 2010 that CPC was on actual notice that Central States intended to assess CPC with withdrawal liability. But, even using the December 1, 2009 date, there can be no breach because the Agreement terminated on November 27, 2009, *before* the earliest date that CPC could have incurred the withdrawal liability as a matter of law.

## II.    THE UNAMBIGUOUS LANGUAGE OF THE AGREEMENT DOES NOT INCLUDE WITHDRAWAL LIABILITY.

### A.    As CPC Concedes, Withdrawal Liability Is Not Included In The Plain Language Of The Agreement.

If this Court finds that the Agreement was in force at the time of the purported breach, CPC's claim fails nonetheless because withdrawal liability is not a reimbursable expense under the plain meaning of the Agreement. Abbott was responsible to reimburse CPC only for "services rendered." Withdrawal liability is not for services rendered, as CPC concedes.

As an initial matter, the Agreement provides that Abbott will pay CPC "for *services provided in accordance with the applicable Schedules* attached hereto, which payment shall be made within ten days from the date of each invoice," and that CPC will submit invoices on "*a weekly basis . . . for services herein provided*." (SF, ¶ 9-10, emphasis added.) The April 2002 Schedule A at issue further explains that Abbott shall pay CPC only "for *services rendered as*

12

*follows*." The scope of the reimbursable expenses for "services rendered" is then qualified in the ensuing paragraphs A-E.   Thus, Abbott was responsible for the payments listed in those paragraphs *only* if they were for "services rendered."   During the deposition of John Bickel, CPC's Rule 30(b)(6) corporate representative, president and member of its Board of Directors, Abbott asked Bickel to confirm that the September 2010 invoice—the basis of CPC's claim—"is not for any services rendered by CPC to Abbott, correct." Bickel responded unequivocally, "*Correct*." [10] (SF, ¶ 40, emphasis added.)

That withdrawal liability is not for services rendered is consistent with the law. Withdrawal liability, by definition, is not for services, let alone for past services; rather, it is for future, unfunded pension liability.  *See* 29 U.S.C. §1381 *et seq.*; *see also Carpenters Pension Trust Fund for N. Cal. v. Moxley*, 734 F.3d 864, 870 (9th Cir. 2013) (withdrawal liability is imposed by ERISA to account for the pension fund's needs going forward); (SF, ¶ 44).  Indeed, as CPC's corporate representative explained, withdrawal liability is not related to services previously rendered or even to the drivers, "it's the shortfall that the pension [fund] has in order to pay its obligations."  (SF, ¶ 90.)  Thus, based on the plain meaning and import of the Schedule A, withdrawal liability is not a reimbursable expense.

### B.   Withdrawal Liability Does Not Fall Within Paragraphs A, B Or C Of The April 2002 Schedule A.

Even if withdrawal liability could somehow be considered "for services rendered"—a finding that CPC's own admissions prevent—the plain language of paragraphs A, B and C of the April 2002 Schedule A (the paragraphs CPC relies on to prove its claim) does not include withdrawal liability.  The interpretation of an unambiguous contract is a question of law. *See*

---

[10] Indeed, had withdrawal liability been for services rendered, the Agreement required CPC to submit that invoice on a weekly basis.  (SF, ¶ 10.)  But, as shown in section I, CPC did not invoice Abbott for withdrawal liability until ten months after the parties' Agreement terminated and almost four years after the last CPC driver in Central States provided services to Abbott.

*McCormack v. Citibank, N.A.,* 100 F.3d 532, 538 (8th Cir. 1996) (citation omitted).  "The primary rule in interpreting contracts is to ascertain the intent of the parties and give effect to that intent." *Farm Bureau Town & Country Ins. of Mo. v. Hilderbrand,* 926 S.W.2d 944, 947 (Mo. Ct. App. 1996) (citation omitted). The parties' intent should be determined from the contract alone and not based on extrinsic evidence unless the contract is ambiguous. *See Care Ctr. of Kan. City v. Horton*,  173 S.W.3d 353, 355 (Mo. Ct. App. 2005).  A contract is not ambiguous simply because the parties disagree as to its meaning. *Id.*

To begin, the term withdrawal liability is found nowhere in the April 2002 Schedule A.[11] Paragraph A limits Abbott's reimbursement obligations to wages, fringe benefits and other payments made to, for the benefit of, or relating to the employees supplied under the parties' Agreement. Withdrawal liability is none of these things. Withdrawal liability is, indisputably, neither a wage nor a fringe benefit. (SF, ¶ 41-42.)  And, it is not a payment made to, for the benefit of, or relating to an employee who provided services to Abbott.  Withdrawal liability is paid to the pension fund, not to any employee. *See* 29 U.S.C. §1381 *et seq.*   Next, CPC admits that it cannot identify any specific employee, let alone one who provided services to Abbott, for whom withdrawal liability is made. Indeed, withdrawal liability is for the benefit of Central States as a whole and does not relate to any specific employee, let alone for any specific CPC employee. (SF, ¶ 43.)

In construing the plain language of paragraph A, the Court should also heed the maxim *ejusdem generis*, which provides that "[w]hen words of general description are used in connection with a specific enumeration of articles, the general description will include only

---

[11] The omission of any express reference to "withdrawal liability" in the April 2002 Schedule A is in contrast to schedules A used by CPC with other customers.  In an otherwise identically worded Schedule A between CPC and another customer, CPC expressly references "withdrawal liability," which it deemed a "non-routine pass through cost." (SF, ¶ 51.) CPC further testified that it was fully aware of how to include withdrawal liability in a contract should it so intend.  (SF, ¶ 52.)

articles similar to those specifically mentioned." *Clean Unif. Co. St. Louis v. Magic Touch Cleaning, Inc.*, 300 S.W.3d 602, 610 (Mo. Ct. App. 2009) (internal citation omitted).  Here, paragraph A specifically lists "wages" and "fringe benefits" and then refers generally to "other payments."  The phrase "other payments" should be limited by *ejusdem generis* to payments similar to those specifically enumerated; that is, wages and fringe benefits and other such payments made to the drivers who provided services to Abbott. *See, e.g., Retail Ventures, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 691 F.3d 821, 833 (6th Cir. 2012) (under principle of *ejusdem generis*, general catch-all phrase, "other confidential information of any kind," "must take its meaning from the specific terms with which it appears").  As CPC admittedly cannot show that withdrawal liability is a type of wage or fringe benefit to a driver, it cannot show that paragraph A includes withdrawal liability.

Paragraph B cannot support CPC's breach of contract claim as B relates only to increases in payroll costs.  CPC has provided no evidence to suggest that withdrawal liability is a payroll cost; indeed, logic defeats any such argument.

Finally, paragraph C, by its plain language, limits Abbott's obligations to reimbursing CPC for the amounts of holiday and vacation pay, welfare and pension fund contributions or other employee benefits resulting from a union agreement obligation. CPC does not contend that withdrawal liability is holiday or vacation pay or a welfare contribution.  And, by law, withdrawal liability is not a pension fund contribution and does not arise from a union agreement. *See* 29 U.S.C. § 1392 (2014) (payments of withdrawal liability not pension fund contributions); *see also Connors v. B&W Coal Co.,* 646 F. Supp. 164, 169 (D.D.C. 1986) (29 U.S.C. § 1392(a) distinguishes pension fund withdrawal liability from pension fund contributions); *Carpenters Pension Trust Fund for N. Cal. v. Moxley*, 734 F.3d at 870 (same);

*See also Debricini v. Healthco-D.G. Stoughton Co.,* 579 F. Supp. 296, 297-98 (D. Mass. 1984) (withdrawal liability is not an obligation or liability under a union contract). Moreover, CPC confirmed that Abbott already reimbursed CPC for ***all*** pension fund contributions made for drivers assigned to Abbott up to and through 2005, the period in which Abbott utilized Central States drivers from CPC. (SF, ¶ 91.)

Further, an agreement by a party to reimburse another for pension fund contributions will not be construed, absent express language, as an agreement to pay also for pension fund withdrawal liability. *See Superior Pocahontas v. Island Creek,* 656 F. Supp. 796, 798 (S.D. W. Va. 1987), *aff'd* 840 F.2d 11 (4th Cir. 1988).  No such express language is present.  As such, withdrawal liability does not fit within the scope of paragraph C.

In sum, even if withdrawal liability could be construed as a payment for services rendered—which, again, CPC's admissions defeat—none of the language in the succeeding paragraphs makes Abbott responsible for CPC's withdrawal liability.  The plain language of the April 2002 Schedule A warrants summary judgment for Abbott.

## III.   CPC CANNOT PROVE THE PARTIES INTENDED TO INCLUDE WITHDRAWAL LIABILITY IN THE APRIL 2002 SCHEDULE A.

To the extent this Court needs to look beyond the four corners of the parties' Agreement and April 2002 Schedule A to ascertain the parties' intent, there still is no disputed issue of material fact because CPC has absolutely no evidence of a mutual intent to include withdrawal liability. CPC must prove that the extrinsic evidence shows the parties' intent to include withdrawal liability in their April 2002 Schedule A.  CPC cannot meet this heavy burden.

The Court may consider extrinsic evidence of the parties' intent as a matter of law where, as here, such evidence is not in dispute. *See Busch & Latta Painting Corp. v. State Highway Comm'n*, 597 S.W.2d 189, 197 (Mo. Ct. App. 1980); *see also Mark Twain Bank v. Cont'l Bank*,

*N.A.*, 817 F. Supp. 792, 798 (E.D. Mo. 1993) (interpreting Illinois law).  The starting point here is the undisputed fact that withdrawal liability was not initially part of the parties' Agreement. As CPC's Vice President in charge of the Abbott account testified:

> Q.    …when this [1992] agreement was entered into between TLI and Abbott, did you think at all about withdrawal liability at that time?
>
> A.    No.
>
> *       *       *
>
> Q.    So [the 1992 Schedule A] did not intend to address withdrawal liability, is that correct?
>
> A.    That's correct.

(SF, ¶ 24.)

Because there is no dispute that the parties did not contemplate and thus did not include withdrawal liability as part of the scope of the Agreement in 1992, CPC must establish that it was later agreed to by the parties. It cannot. The only relevant changes CPC made to the subsequent Schedules A were to add "payments made pursuant to collective bargaining agreements" and "pension fund contributions."  By its plain language, these changes do not introduce withdrawal liability into the parties' bargain.[12]  As set forth in section II, *supra*, withdrawal liability is not a payment pursuant to a collective bargaining agreement and is not a pension fund contribution.

CPC also concedes that the parties never discussed withdrawal liability in the context of any subsequent Schedules A.  (SF, ¶ 37, 39.)  Moreover, when CPC began supplying union drivers to provide services to Abbott in the mid-1990s, there is also no evidence the parties discussed withdrawal liability then in the context of their Agreement.  (SF, ¶ 27.)  In fact, CPC

---

[12] Nor is it reasonable to find that Abbott would have agreed to pay CPC's withdrawal liability. One of the reasons Abbott used third party driver services, like CPC, was to enable it to maintain and control costs, a fact CPC does not dispute.  (SF, ¶ 4.) Agreeing to pay CPC's withdrawal liability, the timing and amount of which Abbott had no control over, would have defeated the reason Abbott contracted with CPC in the first place.

testified that there were no written communications from February 1992 to April 2002 indicating that Abbott had become responsible for withdrawal liability. (SF, ¶ 39.) All that CPC can potentially point to is an alleged conversation in 2001 about withdrawal liability generally, but that purported conversation took place years after CPC began supplying union drivers under the Agreement and no witness can recall the specific details of it.  (SF, ¶ 53-54.)  There is no evidence the parties agreed to include withdrawal liability in their contract in 2001 and CPC's attempt to add it after the fact fails under well-established contract law.  *See R-Way Furniture Co. v. Powers Interiors, Inc*., 456 S.W.2d 632, 637 (Mo. Ct. App. 1970) ("It is clear that parties to an executory contract may revise or modify their contract prior to breach, so long as there is consideration for the revision or modification . . . ."); *Watkins v. GMAC Fin. Servs*., 337 Ill. App. 3d 58, 64, 785 N.E.2d 40, 44 (2003) ("A contract modification must satisfy the same criteria required for a valid contract: offer, acceptance, and consideration. . . . Preexisting obligations are not sufficient consideration.").  CPC has not alleged, let alone identified, any such consideration.

The first communication CPC's corporate representative could identify where CPC informed Abbott of its intent to hold Abbott partially responsible for withdrawal liability, should it arise, occurred in 2003.  (SF, ¶ 55-56.)  But in direct response to that verbal communication, Abbott informed CPC in writing that the parties' Agreement ***did not*** include withdrawal liability. (SF, ¶ 59.)  After 2003, CPC did not cease doing business with Abbott and it did not seek to modify the parties' Agreement or Schedules A on this issue. (SF, ¶ 60.)  CPC also said nothing about withdrawal liability in 2006, at which time none of the remaining CPC drivers rendering services to Abbott were participants in Central States. (SF, ¶ 61.)  CPC, in fact, said nothing further about withdrawal liability until early 2008, at which time Abbott once again informed CPC that it bore no responsibility for CPC's withdrawal liability, should it arise.  (SF, ¶ 61.)

Thus, when CPC unilaterally withdrew from Central States in December 2009, it not only knew that its Agreement with Abbott had terminated, but it knew that Abbott had never agreed to pay for any portion of the resulting withdrawal liability.   Just as the decision to withdraw from Central States was CPC's, not Abbott's, so was the obligation to pay the resulting withdrawal liability. *See Transpersonnel, Inc. v. Roadway Express, Inc.*, 422 F.3d 456, 462 (7th Cir. 2005) (holding it unfair to attribute pension liability to Defendant because "[t]here is nothing in the parties' contract that would have permitted [Defendant] to dispute the amounts paid into the fund by [Plaintiff], make its own calculation of the amount owed, to request a refund of erroneously large payments, to have any input in the terms of the [collective bargaining agreement], or, most importantly, to make any payments directly to the pension fund at all.").

Finally, the Agreement and the April 2002 Schedule A are form documents drafted by CPC. (SF, ¶ 14, 31.) Accordingly, to the extent the Court cannot glean the parties' intent on the issue of withdrawal liability despite all of the above, the Court should construe the contract in Abbott's favor.   *See Mo. Consol. Health Care Plan v. Blue Cross Blue Shield of Mo.*, 985 S.W.2d 903, 910 (Mo. Ct. App. 1999) (construing contract against the drafting party where the parties' intent could not otherwise be determined from parol evidence); *see also Specialty Rests. Corp. v. Gaebler*, 956 S.W.2d 391, 395 (Mo. Ct. App. 1997) ("When all else fails, an agreement that is ambiguous should be construed against the drafter.") (internal citations omitted).

The timing of the alleged breach, the plain language of the parties' Agreement and April 2002 Schedule A, and the undisputed extrinsic evidence each warrants summary judgment in favor of Abbott.

## CONCLUSION

For the reasons set forth above, Abbott respectfully requests that this Court grant its

Motion for Summary Judgment on CPC's breach of contract claim.


Date:  5 September 2014                    Respectfully submitted,

                                          /s/ *Tracy A. Hannan*
                                          Kal K. Shah (Ill. #6275895) (Admitted pro hac)
                                          Tracy A. Hannan (Ill. #6281834) (Admitted pro hac)
                                          **EDWARDS WILDMAN PALMER LLP**
                                          225 West Wacker Drive, Ste. 3000
                                          Chicago, Illinois 60606
                                          Tel:  312-201-2000
                                          Fax:  312-201-2555

                                          *Attorneys for Defendant*
                                          *Abbott Laboratories, Inc.*