# EXHIBIT A

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MISSOURI
# EASTERN DIVISION

| | | |
|---|---|---|
| **CPC LOGISTICS, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **ABBOTT LABORATORIES, INC.,** | ) | **Case No. 4:13-cv-228-JCH** |
| | ) | |
| **Defendant.** | ) | |

## DEFENDANT ABBOTT LABORATORIES, INC.'S RESPONSE TO PLAINTIFF CPC LOGISTICS, INC.'S STATEMENT OF <u>UNCONTROVERTED MATERIAL FACTS</u>

Defendant Abbott Laboratories, Inc. ("Abbott"), pursuant to Fed. R. Civ. P. 56 and E.D. Mo. L.R. 4.01(E), respectfully submits this response to Plaintiff CPC Logistics, Inc.'s ("CPC's") Statement of Uncontroverted Material Facts. For each fact, Abbott sets forth its position and (if applicable) whether it contends a genuine issue of material fact exists.[1]

1.      CPC provides truck drivers and related logistics services to large corporations that operate their own transportation fleets. Complaint Exhibit A, ¶ 1 (Doc. #1-1) ("Agreement" or "Agmt.").

**ABBOTT'S RESPONSE:**  Abbott does not dispute that CPC provides truck drivers and related logistics services to large corporations.  In Abbott's case, however, it contracted with

---

[1] Many of CPC's statements include inadmissible facts, improper and argumentative characterizations, or conclusions of law.  Most, however, are irrelevant as contract interpretation is a matter of law, and extrinsic evidence, if considered, must be related to the contract.  Most of CPC's statements are unrelated to the contract, and, indeed, are related to events occurring some 10 years after the contract was signed.  To the extent Abbott does not dispute a statement, it does so presuming the Court finds the evidence admissible and only to the factual aspect of the statement, not any argument, characterizations, or legal conclusions.  Moreover, Abbott's positions are for purposes of summary judgment only as many of the "facts" presented by CPC are either irrelevant to the issue before the Court or unable to be established at trial.

CPC, and CPC provided drivers to operate Abbott's transportation fleets.  Abbott owned or leased the trucks, but CPC handled the operations.  (Abbott SF, ¶ 3.)[2]

2.      Paragraph 2 of the Agreement limits CPC's responsibilities to largely logistical and administrative functions, including handling payroll and benefit payment functions, handling labor negotiations and grievances, and complying with payroll and recordkeeping requirements associated with the drivers. CPC's liability insurance obligations specifically exclude acts connected with the use, loading, and unloading of the vehicles. Agmt. ¶ 2.

**ABBOTT'S RESPONSE:**   Abbott defers to the document for its content.   Abbott disputes any characterization by CPC inconsistent with the language of Paragraph 2 of the Agreement.

3.      CPC's customers pay for all of the costs of providing, operating, maintaining, and insuring the fleet operations, including insuring the operation of the vehicles by the drivers and reimbursing CPC for all driver-related costs. Agmt. ¶ 3; Hendrix Dep. 32:15-33:25.

**ABBOTT'S RESPONSE:**   CPC's statement appears to be a legal conclusion reserved for the Court.   With respect to Paragraph 3 of the 1992 Agreement, Abbott defers to the Agreement for its content.  Specifically, Paragraph 3 limits Abbott's responsibility for "services provided in accordance with the applicable Schedules attached hereto…." Abbott defers to the remainder of Paragraph 3 and the applicable Schedules for the recoverable costs for services rendered. Abbott specifically objects to CPC's characterization that its customers pay for "all of the costs."

Abbott further notes that CPC's cited testimony of Hendrix does not substantiate its broad statement. Mr. Hendrix only testified that Abbott reimbursed CPC for union dues, payroll

---

[2] "Abbott SF" refers to the Statement of Uncontroverted Facts filed by Abbott in support of its Motion and Memorandum in Support of Summary Judgment, filed on September 5, 2014.

costs, and other specific costs for the driver services provided.  (Hendrix Dep. at 32-33, Ex. A-1.)[3]

4.      CPC's claim is based on the parties' February 1, 1992 Agreement ("Agreement") and the "Schedules A" incorporated therein. Complaint Exhibit A (Doc. #1-1). Under the Agreement, Abbott agreed to "Pay CONTRACTOR [CPC] for services provided in accordance with the applicable Schedules attached hereto." Agmt. ¶ 3a.

**ABBOTT'S RESPONSE:**   Undisputed.  Abbott further defers to the Agreement and Schedules A for their content.

5.      The Agreement was executed by TLI, Inc. and Abbott. The Agreement was assigned, with Abbott's consent, to TLI's parent corporation Consolidated Personnel Corp., which later changed its corporate name to CPC Logistics, Inc.  Defendant Abbott Laboratories, Inc.'s Responses to Plaintiff's First Request To Admit, Nos. 2 and 3.  *See also* Crowell Dep. Exh. 4; Crowell Dep. 20:1-20:19; 21:11-21:18; 21:21-21:22.

**ABBOTT'S RESPONSE:**   Undisputed.

6.      The initial Schedule A was for Abbott's Kansas City non-union operation. Complaint Exhibit B-1 (Doc. #1-2); Wallis Aff. ¶ 1

**ABBOTT'S RESPONSE:**   Undisputed.

7.      Other Abbott locations were subsequently added to the Agreement, with separate Schedules A for each location.  Wallis Aff. ¶ 2.

**ABBOTT'S RESPONSE:**   Undisputed.

8.      The parties signed "union" versions of Schedules A for union locations, which included different and broader reimbursement language than the initial "non-union" Schedule A.

---

[3] Any citations to the record not cited in Abbott's originally filed Statement of Uncontroverted Material Facts ("Abbott SF") or in CPC's Statement will be included here as Exhibit A-1.

Wallis Aff. ¶ 2; Terry Dep. Exh. 8. The "union" Schedule A included new language requiring reimbursement for payments required: (i) "pursuant to any collective bargaining agreement" (Paragraph A); (ii) payments "made to, for the benefit of or in any manner relating to the personnel supplied under the Agreement" (Paragraph A); (iii) "pension fund contributions applicable to or required with respect to the employees provided hereunder" (Paragraph C); and (iv) "together with any other employee benefits paid for, in behalf of or in any other manner relating to such employees as a result of or in any manner relating to a union agreement obligation." (Paragraph C). Also, the "non-union" Schedule A, Paragraph C requirement that benefit plan payments be "as a result of mutual agreement" was deleted, eliminating the requirement that Abbott mutually agree to any benefit payments. *Compare*, Terry Dep. Exh. 8 (Paragraph A and C) to Complaint Exh. B-1 (Doc. #1-2) (Paragraph A and C); Wallis Aff. ¶ 2.

**ABBOTT'S RESPONSE:**   Abbott does not dispute that the parties signed "union" versions of Schedules A for union locations and that the first such Schedule A in 1997 contained some additional language from the original "non-union" Schedule A.  The remainder of CPC's statement appears to be a legal conclusion reserved for the Court. Abbott disputes that the "made to, for the benefit" language in (ii) above was added to the "union" Schedule A.  That language also was in the initial 1992 Schedule A.  (Abbott SF, ¶¶ 16-17.)

9.     The first Central States-covered operations were Alta Vista, Jacksonville, Laurinburg, and Rocky Mount. Terry Dep. Exh. 8; Wallis Aff. ¶ 2. Ralph Terry from Abbott signed each of these Schedules A and understood the purpose was to incorporate these Schedules into the Agreement. Terry Dep. 76:11-78:14; 82:19-82:24.

**ABBOTT'S RESPONSE:**   Undisputed.

10.     Effective January 21, 2001, the parties replaced the separate location schedules with a single "All Locations" Schedule A covering all Abbott locations. The January 21, 2001 "All Locations" Schedule A is page 1 of Terry Exhibit 10. The "All Locations" Schedule A incorporated *verbatim* all of the language in the separate "union" Schedules A. The only change in each schedule is in the Paragraph E weekly service fee. Wallis Aff. ¶ 3; Terry Dep. Exh. 10; *Compare* Terry Dep. Exh. 8 to Terry Dep. Exh. 10.

**ABBOTT'S RESPONSE:**    Undisputed.

11.     CPC and Abbott subsequently signed identically worded All Locations Schedules A, covering all Abbott locations, effective March 12, 2001; April 14, 2002; February 1, 2003; and March 16, 2003. Ralph Terry signed each of these Schedules on behalf of Abbott. The only changes in these Schedules from the January 21, 2001 All Locations Schedule A, and from the previously signed "union" Schedules A are in the Paragraph E weekly service fee. The last Schedule A signed between CPC and Abbott is March 16, 2003. Wallis Aff. ¶ 4; Terry Dep. Exhs. 10, 25, 26.

**ABBOTT'S RESPONSE:**    Undisputed.

12.     Abbott Private Fleet Operations Manager Ralph Terry was the ultimate decision-maker with respect to entering into Schedules A with CPC and had the authority to do so. Terry Dep. 33:19-34:4.

**ABBOTT'S RESPONSE:**    Abbott does not dispute that Terry had the authority to enter into the Schedules A.  CPC's statement that Terry "was the ultimate decision maker" is vague and ambiguous, and, thus, Abbott cannot address it without clarification.  Abbott further notes that Terry did not execute and was not involved in the parties' 1992 Agreement and initial 1992 Schedule A.

13.     Abbott has no evidence that it requested or required any changes to any Schedules A before they were signed. Abbott 30(b)(6) Dep. 84:18-84:22; Abbott 30(B)(6) Dep. Exh. 5; Terry Dep. 84:3-84:5.

**ABBOTT'S RESPONSE:**    Undisputed.

14.     Terry has never taken the position with CPC that the Agreement or any of its Schedules A were not binding contracts between CPC and Abbott. Terry Dep. 119:3-119:10.

**ABBOTT'S RESPONSE:**    Undisputed.

15.     Complaint Exhibit A (Doc. #1-1) is the only agreement between CPC and Abbott dated February 1, 1992. Terry is not aware of any agreement between CPC other than Complaint Exhibit A (Doc. #1-1) to which the All Locations Schedule A could be referring. Wallis Aff. ¶ 5; Terry Dep. 111:17-112:4; Terry Dep. Exh. 1.

**ABBOTT'S RESPONSE:**    Undisputed.

16.     CPC made weekly pension contributions to Central States on behalf of the Abbott drivers pursuant to collective bargaining agreements entered into between CPC and various Teamster Local Unions. Wallis Aff. ¶ 6; Central States[4] Dep. 16:4-16:9.

**ABBOTT'S RESPONSE:**    Abbott does not dispute that CPC made weekly pension contributions on behalf of its employees based on CPC's obligations.  Abbott disputes that these payments were made on behalf of Abbott and further objects to the characterization of "Abbott drivers" because all drivers at issue were CPC employees who were provided to Abbott under the parties' separate Agreement and corresponding Schedules.

17.     These contributions were invoiced to Abbott, and Abbott paid them on a regular basis. Wallis Aff. ¶ 6.

---

[4] Andrew Sprau was the designated 30(b)(6) witness for Central States.

- 6 -

**ABBOTT'S RESPONSE:**   Subject to Abbott's response to Statement No. 16, this is undisputed.

18.     Dan Moroski of CPC began doing business with Abbott in the 1970's while working for Leaseway, a competitor of CPC. Moroski Dep. 78:15-78:24; 12:13-12:14; 12:18-12:23; 14:25-15:3.

**ABBOTT'S RESPONSE:**   Undisputed.

19.     Abbott insisted that Leaseway use all union drivers, so Moroski entered into an agreement with Teamsters Local 571 to cover the non-union drivers. The agreement required pension contributions to Central States. Moroski Dep. 21:4-21:8; 21:15-22:3; 22:10-22:13; 22:19-23:15; 24:16-24:23.

**ABBOTT'S RESPONSE:**   Abbott lacks sufficient information to either dispute or agree with this statement.  Abbott further questions Moroski's recollection as to the same.  This statement, however, is not material to this dispute because Moroski testified that CPC alone negotiated the agreement with Teamsters Local 571, which required pension contributions to Central States, and Abbott had no involvement with those negotiations or the specific terms of that agreement.  (Moroski Dep. at 23-24, Ex. A-1.)  Moroski further testified that he has no recollection of any conversation with Abbott about the fact that the CPC drivers would be involved with Central States. (Moroski Dep. at 24-25, Ex. A-1.)

20.     The Abbott drivers represented by Teamsters Local 571 that CPC took over from the former Leaseway Company in July and December 2000 were covered by the Central States Pension Plan prior to CPC's takeover. Moroski Dep. 106:5-106:13; Wallis Aff ¶ 7.

**ABBOTT'S RESPONSE:**   Moroski did not testify at page 106 of his deposition that CPC took over from the former Leaseway Company in 2000 drivers covered by the Central

- 7 -

States Pension Plan.  As there is no factual support for this statement, as required by Fed. R. Civ. P. 56, Abbott disputes this statement.  However, Abbott contends that this alleged fact, even if proven, is immaterial to this dispute.

21.     When CPC took over Abbott union locations, Abbott expected CPC to hire the existing drivers; grant past service credit for seniority, vacation and other purposes; and ensure there was no work stoppage or disruption in driver services. Wallis Aff. ¶ 8; Terry Dep. 49:17-50:1; 51:13-52:11.

**ABBOTT'S RESPONSE:**    The cited testimony does not establish the alleged fact.  To the contrary, in the cited testimony, Terry testified that his primary object was to reduce costs and that he was not concerned with whether or not CPC promised seniority to a driver.  There is no discussion about vacation.  Terry further specified that his main goals in switching vendors were to "save money and keep the fleet running."  (Terry Dep. at 53, Ex. A-1.)

CPC's affidavit from Wallis as to this point is inadmissible and unpersuasive.  Wallis' affidavit is wholly conclusory, and he cannot testify about Abbott's expectations. *See Davis v. Jefferson Hosp. Ass'n*, 685 F.3d 675, 680, n.2 (8th Cir. 2012) (refusing to consider self-serving affidavit submitted for purposes of summary judgment).

22.     CPC invariably assumed the existing labor agreements, many of which included Central States pension obligations. Wallis Aff. ¶ 9.

**ABBOTT'S RESPONSE:**    CPC's statement is unclear as to what labor agreements it "invariably" assumed and that included Central States pension obligations. This statement also relies upon the unsupported, self-serving affidavit of Wallis, which should be inadmissible at summary judgment.

23.     Terry was aware that the driver leasing companies had union contracts, assumed that the new vendors took over the existing union contracts, was aware that the vendors were accepting prior seniority of the drivers to ensure there were no service interruptions, and was kept informed of the status of labor negotiations while they were occurring. Terry was aware that CPC was making contributions to Central States, and knew that could result in withdrawal liability. Terry Dep. 49:17-50:1; 51:13-52:11; 53:7-54:13; 55:1-55:6; 58:9-58:17; 60:2-60:13; 60:24-62:11.

**ABBOTT'S RESPONSE:**   CPC grossly misstates the import of Terry's testimony. Terry testified only that he learned at some point that involvement or payments to a pension plan could result in withdrawal liability.[5] He never testified that he knew at the time of contracting that CPC's contributions to Central States could result in withdrawal liability or that Abbott would be responsible for any withdrawal liability. (Terry Dep. at 54, Ex. A-1.) Terry also testified that he did not approve labor negotiations between CPC and any unions and only knew of the terms of any contracts between CPC and the unions to the extent they were set forth in the Addenda between CPC and Abbott and, thus, were costs to be reimbursed by Abbott. (Terry Dep. at 60-61, Ex. A-1.)

24.     An Abbott-produced document indicates "All negotiations for labor agreements are approved by Abbott Fleet Operations." Terry Dep. Exh. 7.

**ABBOTT'S RESPONSE:**   This statement constitutes inadmissible parol evidence because it is contrary to the express language of the Agreement that states that CPC shall "[h]ave sole responsibility for all labor negotiations, grievances, and related items concerning personnel furnished to [Abbott] under this Agreement. (Agreement, ¶ 2(f).) To the extent the Court

---

[5] Notably, at the time of his deposition, Terry was uncertain of the meaning of withdrawal liability.  (Terry Dep. at 200-201, Ex. A-1.).

considers the referenced document, Abbott defers to the document for its entire content and notes that Terry testified that he did not approve labor negotiations between CPC and any union. (Terry Dep. at 60-61, Ex. A-1.)

25.     In the 1980's, after Moroski began working for CPC, he attempted to get Abbott to switch its driver services business to CPC. Abbott's Fleet Operations Manager at the time, Joe Pachnik, told Moroski that Abbott would not cancel Abbott's agreement with CPC's competitor for fear of incurring withdrawal liability.  Moroski Dep. 38:24-39:24.

**ABBOTT'S RESPONSE:**     This statement is inadmissible as it is pure hearsay.  Fed. R. Civ. P. 801.

26.     Based on this conversation, CPC believed Abbott was aware that driver services arrangements could result in withdrawal liability for the customer. Bickel 30(b)(6) Dep. 84:22-85:11.

**ABBOTT'S RESPONSE:**     The purported conversation in Paragraph 25, even if admissible, took place over 12 years before the parties' agreement.  CPC, thus, could not have based its purported belief on this statement, and, to the extent CPC alleges to have done so, Abbott disputes that such belief was reasonable.  Indeed, in the cited testimony, CPC concedes that it could not "find any communications between CPC and Abbott from February 1992 to April 2002 where CPC informed Abbott that it believed withdrawal liability was part of the contract."   CPC's statement here is also undermined by Moroski's admission that his understanding of Mr. Pachnik's withdrawal liability comment was based on Moroski's "assumptions," that he did not know the details of Abbott's contractual relationship with Leaseway, and that he did not know, and had no opinion on, whether Abbott would, in fact, be liable for Leaseway's withdrawal liability.  (Moroski Dep. at 39-41, Ex. A-1.)

27.     Abbott was aware of withdrawal liability prior to 1992. Abbott 30(b)(6) Dep. 84:24-85:6.

**ABBOTT'S RESPONSE:**    Undisputed.

28.     Between 1998 and 2000, the corporate successor to Leaseway, Employee Solutions ("ESOL"), was experiencing financial problems. Moroski tried to get Terry to switch ESOL's drivers to CPC so Abbott would not incur service interruptions if ESOL suddenly closed. Moroski also warned Terry that "Abbott could be involved in a withdrawal situation reimbursement" to ESOL. Moroski Dep. 96:19-101:19.

**ABBOTT'S RESPONSE:**    Undisputed. Abbott objects, however, to the purported warning from Moroski to the extent CPC seeks to use it for the truth of the matter asserted. *See* Fed. R. Evid. 801.

29.     In the 1970's, Moroski had Leaseway's attorney develop language requiring customers to reimburse unanticipated driver-related costs to protect the "pass through" relationship inherent in the driver leasing industry. Moroski took this language with him to CPC (TLI), and it formed the basis for CPC's reimbursement language. Moroski Dep. 60:14-60:18; 60:24-62:17; 64:25-67:4; 94:6-94:16; 94:19-95:6.

**ABBOTT'S RESPONSE:**    CPC mischaracterizes Moroski's actual testimony. Moroski testified that, while at Leaseway, there was an issue in the area of state unemployment compensation that he requested the lawyer to develop language to address. As he testified:

> The problem was that the states, in the case of state unemployment, would not get the new funding rates for state employment until sometime after the beginning of the first quarter of the year. If there was an increase in that rate, we were having difficulty passing that increase back to the clients because they clients would say we've already paid…So I talked to the attorney, and he drafted language which basically gave us the ability to do a retro-billing for items that we found the cost out after the beginning of the year. So that applied to state unemployment. In

some states workers' compensation, particularly Ohio, which is a monopolistic state.

(Moroski Dep. at 61-62, Ex. A-1.)   When asked to identify what language in the parties' Schedules A addressed the issue he raised at Leaseway regarding state unemployment and workers' compensation rates, Moroski stated: "Well, that issue specifically would be in paragraph B, payroll." (Moroski Dep. at 95, Ex. A-1.)  CPC claims in its motion for summary judgment that only Paragraphs A and C of the Schedules A, specifically the "All Locations" Schedules A, created the withdrawal liability obligation. (CPC Memo at 12-18.)  Moroski also testified that, "[w]hen I was at Leaseway, there was no withdrawal liability." (Moroski Dep. at 64, Ex. A-1.)  These statements, however, are immaterial for purposes of summary judgment.

30.   On April 16, 2001, Terry notified Moroski that Abbott was switching control of Abbott's Jacksonville operations to another vendor. Moroski then informed Terry that Abbott's cancellation was a situation that could contribute to a Central States withdrawal liability situation down the road. Moroski Dep. Exh. 11; 123:2-125:5; 126:14-127:5.

**ABBOTT'S RESPONSE:**   Abbott does not dispute that Terry notified Moroski that Abbott was switching control of Abbott's Jacksonville operations.  Abbott further points out that there is no evidence corroborating CPC's statement that Moroski informed Terry that Abbott's cancellation could contribute to a Central States withdrawal liability situation.  But even if this is assumed true for purposes of summary judgment, Moroski further testified that Terry never agreed with his statement that any withdrawal liability resulting from the switchover would be Abbott's responsibility. (Moroski Dep. at 39-41, Ex. A-1.)

31.   On January 8, 2003, Terry notified Moroski that Abbott was switching control of its Rocky Mount and Alta Vista locations from CPC to another vendor. Moroski Dep. Exh. 12; Prior to the switchover, Moroski told Terry and Abbott Regional Operations Manager Ken

Hendrix that this could result in withdrawal liability, and that CPC was going to bill Abbott for it. Rocky Mount was CPC's largest group of drivers in Central States. Terry did not dispute Moroski's statement that withdrawal liability would be Abbott's responsibility. Moroski Dep. Exh. 12; Moroski Dep. 113:3-113:16, Wallis Dep. 19:15-20:1, 23:11-23:19.

**ABBOTT'S RESPONSE:**   Abbott does not dispute that Terry notified Moroski that Abbott was switching control of its Rocky Mount and Alta Vista locations.  Abbott points out, however, that Moroski and Hendrix testified that Terry never agreed with any prior statement of Moroski that any withdrawal liability resulting from the switchover would be Abbott's responsibility.  (Moroski Dep. at 113, Ex. A-1; Hendrix Dep at 50-51, Ex. A-1.)  And, in June 2003, Abbott expressly informed CPC in writing that it was not obligated for withdrawal liability under the parties' Agreement.  (Abbott SF, ¶ 59.)

32.   Moroski's conversations with Terry regarding Abbott's responsibility for withdrawal liability are corroborated by Hendrix and CPC Vice-President Butch Wallis. Hendrix testified that Moroski informed Terry of the potential of withdrawal liability at several meetings ("rarely was there a meeting that he [Moroski] didn't bring it up"), and that Moroski told Terry this was Abbott's responsibility. Moroski described the withdrawal liability exposure as "large enough that we should consider it in our decisions." Terry did not deny that the responsibility was Abbott's during these meetings. Hendrix indicated he is certain these conversations took place sometime prior to the Rocky Mount changeover in early January 2003. Wallis Dep. 17:19-20:1; Hendrix Dep. 21:16-21:18; 34:1-35:22; 36:3-36:13; 37:2-37:13; 38:1638:20; 39:4-39:12; 39:17-39:24; 40:17-41:12; 46:14-47:4.

**ABBOTT'S RESPONSE:**   Abbott does not dispute that Moroski and Hendrix testified that there were conversations regarding withdrawal liability in 2003.  Moroski, however, also

testified that Terry never agreed with his statement that any withdrawal liability resulting from the switchover would be Abbott's responsibility.  (Moroski Dep. at 113, Ex. A-1.)  Although Hendrix did testify that Moroski raised withdrawal liability with him and Terry, Hendrix testified that Moroski raised the issue of withdrawal liability "infrequently" and, as far as he knew, neither Terry nor anyone else at Abbott ever agreed with Moroski that Abbott would be responsible for withdrawal liability, should it arise.  (Hendrix Dep. at 34, 50-51, Ex. A-1.)

33.     Terry testified "there could have been" withdrawal liability conversations with Moroski or Wallis, but does not recall. Terry testified Moroski or Wallis could have told him withdrawal liability would be Abbott's responsibility, but doesn't recall any specifics. Terry also says there may have been internal discussions within Abbott, but does not recall any specifics. Terry Dep. 114:11-114:16; 115:5-115:19; 115:23-116:24; 117:4-117:8.

**ABBOTT'S RESPONSE:**  Abbott does not dispute that Terry could not recall any discussions regarding withdrawal liability.

34.     After being informed prior to January 2003 that withdrawal liability was Abbott's responsibility, Abbott continued to reaffirm CPC's reimbursement language by signing the February 1, 2003 and March 16, 2003 All Locations Schedules A, without requesting or requiring any changes to the language and without demanding that it exclude withdrawal liability. Wallis Aff. ¶ 10; Abbott 30(b)(6) Dep. 84:18-84:23; Moroski Dep. 245:23-246:12.

**ABBOTT'S RESPONSE:**  Abbott did sign the February 1, 2003 and March 16, 2003 All Locations Schedules A; however, Abbott disputes that it was informed prior to January 2003 that withdrawal liability was Abbott's responsibility.  Moreover, Abbott expressly informed CPC in a June 2003 writing that the parties' Agreement and Schedules A did not include withdrawal liability. (Abbott SF, ¶ 59.)

- 14 -

35.     It was not until June 2003 that Abbott first informed CPC that it disagreed with CPC's position, when Terry faxed an email from Abbott counsel to Wallis. Terry's fax stated, "Butch, FYI!, Ralph." Terry Dep. 164:21-164:25; Terry Dep. Exh. 24; Abbott 30(b)(6) Dep. 101:24-102:10; 102:19-103:4; 103:14-104:3; 104:7-104:19; Abbott 30(b)(6) Dep. Exh. 10.

**ABBOTT'S RESPONSE:**   Abbott does not dispute that Terry faxed an email from Abbott counsel to Wallis in June 2003.  CPC's claim that it was not until June 2003 that Abbott first informed CPC that it disagreed with CPC's position is inconsistent with the prior statements of fact where CPC alleges conversations earlier on this topic, but where it also concedes Abbott never agreed that withdrawal liability was its responsibility.  (Moroski Dep. at 113, Ex. A-1.) Based on the plain language of the Agreement, Abbott believes it never agreed to pay for CPC's withdrawal liability.

36.     Abbott honored the "pass-through" reimbursement language by regularly reimbursing CPC for driver-related expenses not specifically mentioned in the All Locations Schedule A. These costs, not ascertainable in advance, included highway tolls, employee bonuses, meals, phone expenses, airfare, hotels, union grievance settlements, retroactive union contract increases in wages, health and welfare and pension benefits, union dues, employee drug testing costs, and safety meetings. Terry Dep. 120:7-122:20;  127:9-127:17;  127:26-128:4; 128:21-128:25; 135:11-135:14; Terry Dep. Exhs. 13, 14, 16; Hendrix Dep. 32:15-33:25; Wallis Aff. ¶¶ 11-15.

**ABBOTT'S RESPONSE:** Abbott objects to the characterizations that there is "pass-through" reimbursement language and that these costs are not ascertainable in advance.  Abbott further objects to this statement to the extent it is a conclusion of law.  Abbott does not dispute that Terry testified that Abbott paid for reasonably related costs to the drivers' services,

- 15 -

including meals, airfare, drug testing, etc. Abbott disputes that any and all expenses, particularly those voluntarily incurred by CPC after the term of the Agreement and unrelated to driver services, can be passed through to Abbott. Abbott defers to the Agreement and Schedules A for their content.

37.     Terry admitted that these were unknown costs and that they were costs "relating to the employees provided by CPC to Abbott, and were not specifically listed in Schedule A or in any Addendum to Schedule A." Terry Dep. 122:21-122:24; 123:4-123:16.

**ABBOTT'S RESPONSE:** Undisputed.

38.     Terry considers the CPC-Abbott contract as a "pass-through" or "cost plus" agreement. Terry Dep. 140:6-140:9.

**ABBOTT'S RESPONSE:** Undisputed. Terry further testified, however, that CPC could only pass through those costs called for in the parties' Schedules A and corresponding addenda that arose during the period in which the Schedules A and addenda were in effect. (Terry Dep. at 220-21, Ex. A-1.)

39.     The financial status of Central States deteriorated substantially between 1998 and 2009. Dexter Dep. 101:21-102:3; 102:19-102:23.

**ABBOTT'S RESPONSE:** Undisputed.

40.     CPC incurred a complete withdrawal from the plan in 2009. Central States assessed $9,746,204.23 in withdrawal liability against CPC as a result of its complete withdrawal. Contributions made on behalf of the Abbott drivers were included in this withdrawal liability assessment. Central States Dep. 56:23-57:11; 97:17-97:20; 98:16-99:3; 102:23-103:3, Central States Dep. Exh. 12.

**ABBOTT'S RESPONSE:**   Abbott does not dispute that CPC decided to incur a complete withdrawal from the plan in December 2009.   Abbott disputes, however, that any contributions were made on behalf of Abbott drivers.   To the contrary, the drivers at issue were employed only by CPC, and CPC alone made pension fund contributions to Central States for its drivers.

41.    CPC and Central States settled the withdrawal liability assessment in two agreements that provided CPC and each of its customers a 10% discount for a lump sum payment: (1) CPC and/or its customer could pay 90% of that customer's withdrawal liability prior to December 31, 2010, with credit for payments already made; or (2) any customer's withdrawal liability not settled by December 31, 2010 could be paid at 90% on or before March 31, 2011, with 10% annual interest from December 31 until the date of payment. The withdrawal liability amounts for two customers other than Abbott were paid by December 31, 2010, and the withdrawal liability amount for the remaining customers, including Abbott, was paid by CPC in a lump sum on March 23, 2011. Central States Dep. 76:17-78:20; 82:14-83:4; Central States Dep. Exhs. 6 and 7. See Central States Dep. Exh. 6 at ¶¶ 3a. and 3b.

**ABBOTT'S RESPONSE:**    Abbott does not dispute the terms of the settlement between CPC and Central States, but objects to the suggestion that Abbott was a party to that settlement or owed any obligation to Central States. The record is clear that Central States only assessed withdrawal liability against CPC, and Abbott was not involved with or a party to any settlement agreements between CPC and Central States relating to withdrawal liability.  (Abbott SF, ¶ 79.)

42.    Central States tracks contributions for each employer location ("terminal number"). Central States was therefore able to calculate total contributions made for each customer, based on CPC's representation of which locations belonged to which CPC customer.

Central States' records indicate contributions of $1,355,676.33 were made on behalf of Abbott drivers. Central States Dep. 44:7-45:1. Since some Abbott locations were spun off to Hospira on May 1, 2004, one-third of the 2004 contributions for these locations was attributed to Abbott, and two-thirds of the 2004 contributions for these locations was attributed to Hospira. Central States Dep. 69:6-71:1.

**ABBOTT'S RESPONSE:**   Abbott does not dispute that CPC asked Central States to calculate total contributions made for each CPC terminal number and that CPC, in turn, assigned the terminal numbers to its customers. Central States, however, never determined that Abbott was responsible for any portion of CPC's withdrawal liability, and CPC has stipulated that only it, CPC, was statutorily liable to Central States for its withdrawal liability.  (Abbot SF, ¶ 88.)

43.     There is a direct relationship between an employer's contributions to Central States and the amount of its withdrawal liability. This is because withdrawal liability is calculated by dividing an employer's contributions by the total contributions of all employers, and multiplying this ratio by Central States' unfunded vested benefits (UVBs) figure. Therefore, each dollar of contribution has a direct impact on the amount of the employer's withdrawal liability. Abbott's damages expert concedes this fact. Dexter Dep. 116:10-117:15; Behar Dep. 70:19-71:7; 74:1-75:16; 121:3-121:3.

**ABBOTT'S RESPONSE:**   Abbott does not dispute the manner in which withdrawal liability is calculated, but disputes the conclusions CPC draws.  Withdrawal liability is based on a complex actuarial analysis of which a component is the total past contribution of an employer. It results, however, from an employer's decision to cease making future contributions to a multi-employer pension fund, not from past pension contributions.  *See Bay Area Laundry & Dry Cleaning Pension Trust Fund v. Ferbar Corp. of Cal., Inc.*, 522 U.S. 192, 196 (1997) (citing 29

USC § 1383(a)) (an employer incurs withdrawal liability when it effectuates a "complete withdrawal" from the plan, and a "complete withdrawal" occurs when the employer "permanently ceases to have an obligation to contribute under the plan").

44.     The amount of withdrawal liability assessed against CPC by Central States is equal to $2.3440347609 for each dollar of contribution made by CPC over the 10 years before the withdrawal. Abbott's damages expert did not confirm this calculation but said he has no reason to doubt its accuracy. Dexter Dep. 116:10-117:15; Behar Dep. 74:1-74:6.

**ABBOTT'S RESPONSE:**  Disputed.  Withdrawal liability is not assessed by determining a multiplier based on each dollar of contribution.  By statute, withdrawal liability is based upon CPC's calculated share of Central States' unfunded vested benefits in the year immediately preceding the year of withdrawal.   The $2.3440347609 number is a calculation done solely by CPC's expert for purposes of this litigation. Abbott, thus, objects to CPC's suggestion that withdrawal liability is a calculation based upon each dollar of contribution made by CPC.  Abbott's expert merely indicated that he had no reason to doubt that the multiplier was accurately calculated by CPC's expert, but never conceded it had any relevance to this litigation.

45.     Exhibit A of the March 18, 2011 Central States-CPC settlement agreement separates out CPC's withdrawal liability assessment to each CPC customer based on contributions made on behalf of that customer's drivers. The Abbott contributions resulted in an assessed withdrawal liability amount of $3,177,752.44 ("Abbott withdrawal liability"). See Central States Dep. Exh. 7 at its Exh. A (CPC0706). Abbott's expert confirmed that the Abbott withdrawal liability calculation was correct, based on Abbott contributions of $1,355,676. Behar Dep.77:10-78:10

- 19 -

**ABBOTT'S RESPONSE:** Abbott defers to Exhibit A of the March 18, 2011 Central States-CPC settlement agreement for its content. CPC, however, unilaterally allocated its withdrawal liability among certain of its customers, including Abbott, based on its unilateral decision to divide historic contributions among its customers. Using this process, CPC alleges that Abbott is accountable for $3,177,752.44 in withdrawal liability. The contributions for which Abbott reimbursed CPC, however, did not result in this withdrawal liability. CPC's decision to withdraw and the anticipated future shortfall to the fund resulted in withdrawal liability. Abbott's expert did confirm that using CPC's methodology, CPC's calculation was based on purported contributions reimbursed by Abbott of $1,355,676.

46.    Exhibit B of the March 18, 2011 settlement agreement totals the amount paid by CPC for each customer whose withdrawal liability was not settled before December 31, 2010. CPC's total payments for the Abbott withdrawal liability were $2,920,765.64, including the 10% discount and interest charges.[6] *See*, Central States Dep. Exh. 7 at its Exh. B (CPC0707). CPC's Chief Financial Officer confirmed the accuracy of these calculations. Trower Dep. 140:3140:21. The Abbott damages expert did not confirm the 10% discount, interest, or final payment number, but indicated it "looks to be correct." Behar Dep. 79:18-81:15.

**ABBOTT'S RESPONSE:** Disputed. Abbott defers to Exhibit B of the March 18, 2011 settlement agreement for its content. That document purports to show the totals of amounts paid by CPC on behalf of each customer for drivers provided in the past. Abbott disputes that this has any direct relationship to the amount not settled before December 31, 2010. Abbott also disputes that CPC's payments for Abbott withdrawal liability were $2,920,765.64, as even if Abbott were

---

[6] The total amount paid by CPC attributable to the Abbott withdrawal liability is $2,920,765.64, consisting of the 90% principal amount of $2,859,977.20 plus accrued interest through March 23, 2011 (the date of the final payment) of $60,788.44 (columns 2 and 3). Central States Dep. Exh. 7 at its Exh. B (CPC0707). One can arrive at the same total by adding the total interim payments made as of the payment date plus the final outstanding balance paid on March 23, 2011 (columns 4 and 5). *Id.* CPC's total payments of $2,920,765.64 for Abbott are reflected in column 6. *Id.*

subject to liability, this calculation is flawed.  In addition, Abbott is not subject to the interest charges as it is responsible only for reimbursing CPC for the amount of withdrawal liability if a breach of contract is found.

47.     CPC incurred additional "billing charges" that were not credited toward the final settlement payment. Central States Dep. 83:23-85:5. CPC Chief Financial Officer Duane Trower has computed the Abbott portion of the billing charges at $3,483.92. The amount of billing charges can be confirmed by taking the amount of interim payments CPC made on behalf of Abbott ($521,083.86) and which were invoiced by CPC to Abbott, less the amount of those interim payments credited toward the Abbott withdrawal liability ($517,599.94) in Exhibit B to the March 18, 2011 Settlement Agreement between CPC and Central States (Central States Dep. Exhibit 7 at its Exhibit B). Trower Aff. ¶ 2.

**ABBOTT'S RESPONSE:**    Disputed.  Abbott is without knowledge sufficient to know whether CPC incurred additional "billing charges" not credited toward the final settlement payment.   Abbott disputes, however, that any portion of the billing charges are Abbott's responsibility should liability be found under the contract.   Abbott is responsible only for reimbursing CPC for actual costs paid, and Abbott disputes the amount of withdrawal liability assessed by CPC against Abbott.

48.     Abbott's damages expert did not seek to confirm the calculation of "billing charges" attributable to Abbott. Behar Dep. 82:10-82:14.

**ABBOTT'S RESPONSE:**   Undisputed.  Abbott's expert was not asked to undertake this task because Abbott disputes that any billing charges are attributable to Abbott.

49.     CPC has repeatedly invoiced Abbott for this amount ($2,924,249.56). Abbott has not paid these invoices. Bickel 30(b)(6) Dep. 32:11-32:16.

**ABBOTT'S RESPONSE:**    Undisputed.

50.    Both parties' experts testified that withdrawal liability is imposed by the MPPAA amendments to ERISA. Dexter Dep. 135:12-135:23; Behar Dep. 36:3-36:8.

**ABBOTT'S RESPONSE:**    Undisputed.

51.    The initial Central States withdrawal liability demand letter states that its demand for withdrawal liability is "made pursuant to Section 4219 of the Employee Retirement Income Security Act of 1974, as amended (29 U.S.C. 1399(b))." Central States testified that it assesses withdrawal liability because it is required to do so by law. Central States Dep. Exh. 11 at 1 (CPC0598). Central States Dep. 16:4-16:9.

**ABBOTT'S RESPONSE:**    Undisputed.   Abbott further notes that this letter is dated April 2010, five months after the contract at issue was terminated.

52.    Withdrawal liability payments are considered pension contributions for multiple purposes under ERISA and the Internal Revenue Code. They are considered contributions on the plan's income and expense section of its annual Form 5500 filing (Schedule H), and for minimum funding or funding standard account purposes on schedule MB of the plan's annual Form 5500 (*i.e.*, for minimum funding, maximum funding, and accumulated funding deficiency purposes). Dexter Dep. 107:14-113:6; Behar Dep. 43:19-44:16.

**ABBOTT'S RESPONSE:**    Disputed.    Abbott disputes that withdrawal liability payments are considered contributions for multiple purposes under ERISA, as addressed in Abbott's opposition briefing. 29 U.S.C. § 1392, for example, states: "Payments of withdrawal liability under this part shall not be considered contributions, for purposes of this part." Abbott, however, does not dispute that withdrawal liability payments are treated as "contributions" by the pension fund for certain tax-related purposes because they are account for the future shortfall

to a pension fund. *See Carpenters Pension Trust Fund for N. Cal. v. Moxley*, 734 F.3d 864, 870 (9th Cir. 2013) (withdrawal liability is imposed to account for the pension fund's needs going forward). CPC has also admitted that Abbott has reimbursed CPC for all weekly pension contributions made by CPC to Central States relating to drivers provided by CPC to Abbott. (Abbott SF, ¶ 91; *see also* CPC's Amended Response to Abbott's First Interrogatories No. 4, attached here as Exhibit A-1.)

53.     Withdrawal liability payments are employee benefit payments because an employer cannot provide union pensions without exposing itself to withdrawal liability. The consequence of pension contributions is the accruing of withdrawal liability. You cannot have one without the other—withdrawal liability is part and parcel of the union pension benefit because an employer that provides union pension benefits must accept the attendant withdrawal liability framework.  Dexter Dep. 83:5-84:4; 128:15-131:2; 132:22-133:19.

**ABBOTT'S RESPONSE:**   Disputed.   Paragraph 53 contains arguments to which no response is required.   To be clear and as set forth in its Motion for Summary Judgment and Opposition to CPC's Motion for Summary Judgment, Abbott denies that withdrawal liability payments are employee benefits and denies that an employer cannot provide union pensions without exposing itself to withdrawal liability. Abbott further denies that the consequence of pension contributions is the accruing of withdrawal liability. Abbott denies that withdrawal liability is part and parcel of the union pension benefit.

54.     Abbott's expert agrees an employer cannot provide union pension benefits without creating a contingent withdrawal liability. Behar Dep. 45:12-46:8.

**ABBOTT'S RESPONSE:**   Disputed.   CPC misconstrues the import of Behar's testimony.  In the testimony CPC cites, Abbott's expert, Behar, agreed that withdrawal liability is

- 23 -

a "contingent cost," that an employer "incurs a potential contingent liability" if it chooses to leave the fund, and that an employer cannot provide a "union pension benefit without at least exposing [itself] to the possibility of withdrawal liability payments." (Behar Dep. at 45-46, Ex A-1.)

55.     Abbott's expert report states that "CPC's claim that Abbott is responsible for a portion of CPC's withdrawal liability essentially seeks to place Abbott, instead of CPC, in the position of the contributing employer." Behar Dep. 33:4-33:7; Behar Dep. Exh. 3 at 8.

**ABBOTT'S RESPONSE:**   Abbott's expert report does contain the above sentence. Abbott defers to the report for its content.

56.     Behar testified that his "reasonableness" theory is essentially a "fairness" argument because if Abbott were the employer, it could have exited the fund in 2005. Behar Dep. 112:5-113:6.

**ABBOTT'S RESPONSE:**   Undisputed.

57.     Abbott's expert testified that his "hypothetical" was not an argument based on what the CPC-Abbott contract provides. Behar Dep. 113:7-113:10.

**ABBOTT'S RESPONSE:**   Undisputed.

58.     Abbott's expert testified that the analysis he made in subsection 2 [of Section 3] of his expert report did not begin at a starting point with what CPC had to pay Central States. Behar Dep. 112:5-113:6; 121:8-121:11; Behar Dep. Exh. 3 (Subsection 2 of Section 3 of his report begins on page 8).

**ABBOTT'S RESPONSE:**   Undisputed.

59.     Behar conceded this theory would have left CPC unreimbursed for the increased amount of withdrawal liability between 2005 and 2009 that related to the Abbott contributions. Behar Dep. 60:13-61:1; 119:24-120:9.

**ABBOTT'S RESPONSE:**     Disputed.  In the testimony of Behar cited by CPC, Behar conceded only that his theory would leave CPC unreimbursed by Abbott for the increase in withdrawal liability CPC incurred by withdrawing in 2009 instead of 2005.  Behar does not state that this increase is due to or related to "the Abbott contributions."  In fact, he refuted the suggestion that Abbott's contributions gave rise to an increase in CPC's withdrawal liability. Any increase was due to an increase in Central States' unfunded vested benefits between 2005 and 2009. (Behar Dep. at 59-60, Ex. A-1.)

60.     Behar testified that this is how "most" (not "all") business transactions are constructed, he *thought* this is the how the relationship between Abbott and Hospira would play out in a *normal* business setting and, generally speaking, this would be the *normal* outcome "unless there's some other aspect of the sale agreement that specifically covers that." Behar Dep. Exh. 3 at 7; Behar Dep. 102:8-102:16; 110:23-111:11.

**ABBOTT'S RESPONSE:**     Undisputed.

61.     Behar did not review or rely upon the documents that effectuated the Abbott-Hospira spinoff. Behar Dep. Exh. 3 at 2-3.

**ABBOTT'S RESPONSE:**     Undisputed.

62.     Behar's involvement with multiemployer plans at Sara Lee was "pretty limited." He prepared a report on the financial implications of union pension plans, and did another project analyzing Sara Lee's liability in Central States.  Behar Dep. 13:19-14:24.

- 25 -

**ABBOTT'S RESPONSE:**   Undisputed.   Abbott objects, however, to the extent CPC seeks to characterize this as the entirety of Behar's experience as he further clarified that his work with multi-employer pension funds at the time "was a minority, but it was not insubstantial. I spent about 25% of my time working on multi-employer plans from the time I joined A.S. Hansen to the time I left Mercer."  (Behar Dep. at 16, Ex. A-1.)  Behar consulted for Sara Lee during this period.

63.    Behar conceded this issue is not "per se a withdrawal liability matter," his professed area of expertise. Behar Dep. 105:11-105:14. When asked what qualified him to testify to this, he stated that he worked with a large corporation [Sara Lee] that did a lot of business transactions. Behar Dep. 102:17-102:24; Facts ¶ 63. Behar admitted he is not being engaged to interpret how CPC's Agreement would treat the spinoff and that the pre-Hospira pension contributions issue would be a matter between Abbott and Hospira. Behar Dep. 103:1104:15.

**ABBOTT'S RESPONSE:**   Undisputed.   Abbott clarifies, however, that Behar does not opine on the impact of any agreement between Abbott and Hospira, but rather as to how withdrawal liability should be applied based on industry standards absent specific agreements to the contrary.

64.    Behar was unable to explain the basis for Abbott's request that he assume these contributions did not exist, other than to say he understood them to be based on a "contractual" or "legal" issue. Behar Dep. 62:24-63:7.

**ABBOTT'S RESPONSE:**   Undisputed.   The factual evidence supporting any assumptions made by Behar in his damages opinions will be presented at trial, assuming this matter is not resolved on summary judgment.

- 26 -

Date:  25 September 2014                    Respectfully submitted,

                                           /s/ *Tracy A. Hannan*
                                           Kal K. Shah (Ill. #6275895) (Admitted pro hac)
                                           Tracy A. Hannan (Ill. #6281834) (Admitted pro hac)
                                           **EDWARDS WILDMAN PALMER LLP**
                                           225 West Wacker Drive, Ste. 3000
                                           Chicago, Illinois 60606
                                           Tel:  312-201-2000
                                           Fax:  312-201-2555

                                           *Attorneys for Defendant*
                                           *Abbott Laboratories, Inc.*