# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | | |
|---|---|---|
| CPC LOGISTICS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:13CV228 JCH |
| | ) | |
| ABBOTT LABORATORIES, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

This matter is before the Court on Defendant Abbott Laboratories, Inc.'s ("Abbott") Motion for Summary Judgment, filed September 5, 2014. (ECF No. 104). The motion is fully briefed and ready for disposition.

## BACKGROUND

Abbott is a U.S. pharmaceutical and healthcare products company with several manufacturing operations located throughout the country. (Defendant Abbott Laboratories, Inc.'s Statement of Uncontroverted Material Facts ("Abbott's Facts"), ¶ 1). Historically, Abbott owned or leased its own trucks, and used drivers to deliver its products within operation sites and to healthcare facilities. (Id., ¶ 2). During the period in question, Abbott did not employ truck drivers; rather, it contracted with driver leasing companies, such as TLI, Incorporated ("TLI"), the predecessor of Plaintiff CPC Logistics, Inc. ("CPC"), to provide drivers. (Id., ¶ 3). The driver leasing companies employed the drivers and managed every aspect of their employment, including hiring, training, wages, payroll, and benefits. (Id., ¶ 5). In the case of union drivers, the leasing company also was responsible for the negotiation and management of any applicable collective bargaining agreements. (Id.).

On or about February 1, 1992, Abbott and TLI entered into a contract for the supply of a single non-union driver to Abbott's Kansas City facility (the "Agreement"). (Abbott's Facts, ¶¶ 7, 15, 18). The Agreement required TLI, *inter alia,* to provide Abbott with licensed drivers, pay all wages and benefits due to the drivers, pay all applicable taxes, and bear sole responsibility for all labor negotiations and related items concerning drivers furnished to Abbott under the Agreement. (Id., ¶ 8). Abbott in turn agreed, *inter alia,* to pay TLI for the services provided in accordance with the Schedules attached to the Agreement, for which TLI would invoice Abbott on a weekly basis. (Id., ¶¶ 9, 10). Either party was permitted to cancel the Agreement with thirty days' written notice. (Id., ¶ 11).

The Agreement included an original Schedule A, also dated February 1, 1992 ("1992 Schedule A"), that identified the specific payments "for services rendered" for which Abbott, the "CUSTOMER", would reimburse TLI, the "CONTRACTOR". (Abbott's Facts, ¶¶ 13, 16). These payments included:

> A.) The amount of wages, fringe benefits and other payment required to be made by CUSTOMER (sic)[1] under the Agreement, including all payments made to or for the benefit of the employees supplied under the Agreement pursuant to any agreement, statute or governmental regulation.
>
> B.) It is understood and agreed that if, during the effective term of this Agreement, CONTRACTOR is required to increase such payroll cost as a result of the determination of any governmental authority, then CUSTOMER will reimburse CONTRACTOR for such increases, at cost.
>
> C.) CUSTOMER also agrees to reimburse CONTRACTOR for employees' holiday and vacation pay and health insurance together with any other employee benefits paid for or in behalf (sic) such employees as a result of mutual agreement.

(Id., ¶ 16). Both the Agreement and the 1992 Schedule A were form documents drafted by TLI, and neither mentions "withdrawal liability." (Id., ¶¶ 14, 19). Furthermore, Charles Jones, the

---

[1] The parties agree that this is a typographical error that should have said "CONTRACTOR", i.e., CPC, not "CUSTOMER". (Abbott's Facts, ¶ 17).

CPC employee who executed the 1992 Agreement and 1992 Schedule A for CPC, testified that

he never had any discussions, nor knew about any discussions concerning withdrawal liability,

either with Abbott or internally at CPC. (Id., ¶ 20).[2]

CPC assumed the Agreement, including the 1992 Schedule A, from TLI in February,

1997. (Abbott's Facts, ¶ 25). The parties entered into several other Schedules A after the 1992

Schedule A, to address additional Abbott locations or changes in the service charges. (Id., ¶ 26).

CPC also began providing union drivers to perform services for Abbott in the mid- to late-1990s,

and for those drivers CPC managed all labor union responsibilities, including negotiating

collective bargaining agreements and making pension fund contributions. (Id., ¶¶ 27, 28).[3]

Certain of the collective bargaining agreements required CPC to make pension fund

contributions to the Central States, Southeast and Southwest Areas Pension Fund ("Central

States") on behalf of its drivers, some of whom provided services to Abbott. (Id., ¶ 29).

In April, 2002, CPC and Abbott entered into a subsequent Schedule A (the "April 2002

Schedule A"), that covered all of the locations for which CPC supplied drivers to Abbott.

(Abbott's Facts, ¶ 30). The April 2002 Schedule A was also a form schedule prepared by CPC,

and CPC cites to this Schedule as the basis for Abbott's withdrawal liability obligation. (Id., ¶¶

---

[2] Abbott maintains withdrawal liability was neither discussed nor contemplated as part of the Agreement or 1992 Schedule A. (Abbott's Facts, ¶ 21-22, 24). CPC disputes this, claiming that although it could point to no specific discussions with Abbott regarding withdrawal liability at the time the Agreement was executed, several CPC executives assumed Abbott would be responsible for withdrawal liability if it were incurred at any point in the future. (CPC's Response to Defendant Abbott Laboratories, Inc.'s Statement of Uncontroverted Material Facts ("CPC's Response to Abbott's Facts"), ¶¶ 21, 22).

[3] There is no evidence that the parties discussed or contemplated withdrawal liability at the time CPC began supplying union drivers to Abbott. (Abbott's Facts, ¶ 27).

31, 32; Complaint, ¶ 30).[4]  The language of the April 2002 Schedule A differed from that of the

original 1992 Schedule A, in that it included reimbursement for payments that CPC made

pursuant to collective bargaining agreements, including pension fund contributions.  (Abbott's

Facts, ¶ 34).  Specifically, the April 2002 Schedule A required Abbott to pay CPC "for services

rendered as follows:"

> A.)     The amount of wages, fringe benefits and other payment required to be made by
> CUSTOMER (sic)[5] under the Agreement, or pursuant to any collective bargaining
> agreement, statute or governmental regulation, including, but not limited to, all payments
> made to, for the benefit of or in any manner relating to the personnel supplied under the
> Agreement.
>
> B.)     It is understood and agreed that if, during the effective term of this Agreement,
> CONTRACTOR is required to increase such payroll cost as a result of the determination
> of any governmental authority, then CUSTOMER will reimburse CONTRACTOR for
> such increases, at cost, effective as of the date CONTRACTOR shall become subject
> thereto.
>
> C.)     CUSTOMER also agrees to reimburse CONTRACTOR holiday and vacation pay
> and health, welfare and pension fund contributions applicable to or required with respect
> to the employees provided hereunder, together with any other employee benefits paid for,
> in behalf of or in any other manner relating to such employees as a result of or in any
> manner relating to a union agreement obligation.

(Id., ¶ 35).  The April 2002 Schedule A makes no mention of withdrawal liability, and the CPC

employee who executed the April 2002 Schedule A—its then Vice President—admits that

withdrawal liability was not discussed in connection with the April 2002 Schedule A.  (Id., ¶ 39).

In addition to the Schedules A, the parties also periodically executed Addenda, which

identified the specific amounts of wages and benefits for which Abbott would be responsible

under the governing Schedule A.  (Abbott's Facts, ¶ 47).  The Addenda, for example, identified

---

[4] The parties entered into subsequent Schedules A on February 1, 2003, and March 16, 2003.
(Abbott's Facts, ¶ 45).  As the relevant language is identical, the Court will refer solely to the
April 2002 Schedule A throughout the remainder of this Order.
[5] Again, the parties agree that this should have said "CONTRACTOR", not "CUSTOMER".
(Abbott's Facts, ¶ 38).

the effective hourly wage rate; tax rates for social security, federal and state unemployment, and workers compensation; holiday and vacation rates; health and welfare and pension contribution amounts per week; and sick pay rates. (Id., ¶ 48). The parties executed their last Addendum in January, 2006, and none of the Addenda mentions withdrawal liability. (Id., ¶¶ 49, 50).

CPC alleges that in or around April, 2001, its employee Daniel Moroski raised withdrawal liability generally during a telephone conversation with an Abbott employee, Ralph Terry. (Abbott's Facts, ¶ 53).[6] The first corroborated evidence of a discussion between the parties regarding withdrawal liability is from 2003, however, when Abbott considered terminating CPC drivers at its Rocky Mount, North Carolina location. (Id., ¶ 55). At that time, CPC sought to persuade Abbott not to cancel CPC's services, by claiming the cancellation might trigger a partial withdrawal liability. (Id., ¶ 56). Abbott nevertheless ceased using CPC drivers at Rocky Mount in January, 2003, and in June, 2003, Abbott informed CPC via a communication from its legal counsel that Abbott was not contractually liable for any withdrawal liability that CPC might incur. (Id., ¶¶ 58, 59). Despite this communique, CPC never sought to amend the language of the April 2002 Schedule A, nor did it cease doing business with Abbott as a result of its position. (Id., ¶ 60).

In 2004, as a result of a spin-off by Abbott, Abbott largely ceased using CPC drivers. (Abbott's Facts, ¶ 62). Following the transfer, very few of the remaining drivers providing services to Abbott were involved in Central States, and by 2006, none of the drivers providing services to Abbott were participants in Central States. (Id., ¶¶ 64, 65). As a result, the last pension fund contribution made by CPC to Central States on behalf of a driver providing services to Abbott was in 2005. (Id., ¶ 66).

---

[6] Mr. Terry has no recollection of any such discussion. (Abbott's Facts, ¶ 54).

In June 2007, Abbott sent CPC notice of termination of the Agreement, at least as to all of its locations that used union drivers. (Abbott's Facts, ¶ 67). In July, 2007, Abbott informed CPC of its intent to continue using CPC drivers at a single non-union location in Texas. (Abbott's Facts, ¶ 67). On October 28, 2009, Abbott notified CPC of its intent to terminate that final location, effective thirty days thereafter. (Id., ¶ 68). The parties thus agree that the Agreement and any Schedules A between Abbott and CPC terminated entirely no later than November 27, 2009. (Id.).

Sometime in the fourth quarter of 2009, CPC permanently ceased to have an obligation to contribute to Central States, thereby effecting a complete withdrawal. (Abbott's Facts, ¶ 73).[7] CPC unilaterally made the decision to withdraw from the Fund, despite the fact that it believed its customers ultimately were responsible for any assessed withdrawal liability. (Id., ¶ 75). On April 21, 2010, Central States assessed withdrawal liability against CPC in the amount of $9,770,183.71. (Id., ¶ 76). CPC disputed the initial assessment, and worked with Central States for the next six months to reach a final assessment of $9,746,204.23 on October 18, 2010. (Id.). In the interim, on or about September 3, 2010, CPC sent Abbott an initial invoice for reimbursement of part of its alleged portion of the withdrawal liability, which totaled $3,177,752.44. (Id., ¶ 77). In March, 2011, CPC and Central States reached a settlement on CPC's withdrawal liability, pursuant to which CPC agreed to pay 90% of the total withdrawal liability assessed against it. (Id., ¶ 78). As a result, CPC sought a reduced payment from Abbott, in the amount of $2,403,165.80. (Id., ¶ 79).

---

[7] Abbott claims the withdrawal occurred on December 1, 2009. (Abbott's Facts, ¶ 73). CPC counters that its obligation to contribute to Central States ceased on October 31, 2009. (CPC's Response to Abbott's Facts, ¶ 73).

On April 12, 2011, CPC submitted a final invoice to Abbott in the amount of $2,924,249.56, allegedly constituting the total amount paid by CPC to Central States that was directly attributable to and on account of the Abbott withdrawal liability. (Complaint, ¶ 27). When Abbott refused to satisfy CPC's demand for reimbursement, CPC filed the instant Complaint on February 4, 2013, alleging a single count for breach of contract. (ECF No. 1). Specifically, CPC asserts that the 1992 Agreement and April 2002 Schedule A constitute a valid and enforceable contract, that the terms of the Agreement and April 2002 Schedule A require Abbott to reimburse CPC for a portion of CPC's incurred withdrawal liability, and that Abbott has failed and refused to reimburse CPC for a portion of CPC's withdrawal liability despite repeated demands from CPC. (Complaint, ¶¶ 30-33).

As noted above, Abbott filed the instant Motion for Summary Judgment on September 5, 2014, asserting the undisputed material facts warrant judgment as a matter of law in its favor. (ECF No. 104).

## SUMMARY JUDGMENT STANDARD

The Court may grant a motion for summary judgment if, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The substantive law determines which facts are critical and which are irrelevant. Only disputes over facts that might affect the outcome will properly preclude summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is not proper if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Id*.

A moving party always bears the burden of informing the Court of the basis of its motion. *Celotex*, 477 U.S. at 323. Once the moving party discharges this burden, the nonmoving party

must set forth specific facts demonstrating that there is a dispute as to a genuine issue of material fact, not the "mere existence of some alleged factual dispute." Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 247. The nonmoving party may not rest upon mere allegations or denials of its pleadings. *Anderson*, 477 U.S. at 256.

In passing on a motion for summary judgment, the Court must view the facts in the light most favorable to the nonmoving party, and all justifiable inferences are to be drawn in its favor. *Anderson*, 477 U.S. at 255. The Court's function is not to weigh the evidence, but to determine whether there is a genuine issue for trial. *Id*. at 249.

## DISCUSSION

**I.    Did The Parties Have A Contractual Relationship At The Time The Alleged Breach Occurred?**

Under Missouri law, "[a] breach of contract action includes the following essential elements:  (1) the existence and terms of a contract; (2) that plaintiff performed or tendered performance pursuant to the contract; (3) breach of the contract by the defendant; and (4) damages suffered by the plaintiff." *Keveney v. Missouri Military Academy*, 304 S.W.3d 98, 104 (Mo. banc 2010) (citation omitted). *See also Eagle Fuels, LLC v. Perrin*, 10 F.Supp.3d 1028, 1040 (W.D. Mo. 2014) (same). Upon consideration, the Court finds CPC sufficiently has alleged the requisite elements of its cause of action for breach of contract. In other words, CPC has alleged (1) that the terms of the Agreement and April 2002 Schedule A required Abbott to reimburse CPC for withdrawal liability incurred and paid on behalf of workers provided to Abbott[8], (2) that CPC paid Central States withdrawal liability on behalf of drivers provided to Abbott and invoiced Abbott for reimbursement for same, (3) that Abbott breached the parties'

---

[8] Abbott's contention that the Agreement and April 2002 Schedule A did not so require is addressed in later sections of this Order.

contract by failing to reimburse CPC the cost of the assessed withdrawal liability, and (4) that CPC therefore suffered damages in the amount of $2,924,249.56.

In its Motion for Summary Judgment Abbott maintains CPC's claim for breach of contract fails, because the contract between Abbott and CPC was terminated at the time the alleged breach occurred. Abbott rests this argument on the following reasoning: The Agreement, including any applicable Schedule A, was terminated in its entirety as of November 27, 2009; CPC unilaterally withdrew from Central States (and thus incurred potential withdrawal liability) on December 1, 2009; CPC initially was assessed withdrawal liability by Central States in April, 2010; and CPC first invoiced Abbott for a portion of its purported share of CPC's withdrawal liability in September, 2010, over nine months after the parties' contract terminated. (Memorandum in Support of Defendant Abbott Laboratories, Inc.'s Motion for Summary Judgment ("Abbott's Memo in Support"), P. 11). Abbott thus maintains that CPC's claim fails, because any alleged breach occurred at a time when the contract between the parties no longer existed. (Id., citing *Shaub and Williams, L.L.P. v. Augme Technologies, Inc.*, 2014 WL 625390, at *6 n. 6 (S.D.N.Y. Feb. 14, 2014), for the proposition that "a claim for breach of contract may not be made based on an alleged breach that occurred, in Defendant's own words, after the contract was terminated and, therefore, no longer in existence.").

Upon consideration the Court finds *Shaub* is distinguishable, as in that case the plaintiff provided its services, and thus the potential liability accrued, after the contract at issue was terminated. Viewing the facts in the light most favorable to CPC, the Court finds the same is not true here. In other words, the Court's review of the record reveals CPC presents evidence that it effected its withdrawal from Central States not on December 1, 2009, as asserted by Abbott, but rather on October 31, 2009, a date during which the parties' Agreement may still have been in

effect.[9]  Thus, a genuine issue of material fact exists as to whether CPC accrued liability to Central States on behalf of Abbott drivers during the term of the Agreement.

Under Missouri law, "[w]here a party terminates a contract according to its provisions, the contract and all rights thereunder are wholly abandoned." *HGS Homes, Inc. v. Kelly Residential Group, Inc.*, 948 S.W.2d 251, 255 (Mo. App. 1997) (citation omitted).  The parties' discharge from their contractual duties, however, applies to "promises that are still wholly executory." *Id.* (citing ARTHUR CORBIN, 6 CORBIN ON CONTRACTS Section 1266, p. 66 (1962)).  In other words, "[a]fter termination of a contract all of the parties' *unperformed undertakings* are ended." *Id.* (emphasis added).  *See also* ARTHUR CORBIN, 6 CORBIN ON CONTRACTS Section 1266, p. 66 (1962) ("The exercise of a reserved power of termination will usually have prospective operation only; it will discharge both parties from their contractual duty to perform promises that are wholly executory, but will not discharge the duty to make reparation for breaches that have already occurred.").

In viewing the facts in the light most favorable to CPC, the Court finds the parties' promises here were not wholly executory at the time the Agreement terminated.  In other words, although as of November 27, 2009, CPC had yet to pay Central States withdrawal liability, its obligation to do so allegedly had fully accrued at that time.  All that remained was for CPC to receive its final tally from Central States, pay the balance, and invoice Abbott for the portion of liability attributable to Abbott drivers.  As the basis for CPC's cause of action may have occurred

---

[9] Abbott maintains CPC is bound by its admission in the Complaint that it withdrew from Central States on December 1, 2009.  (Defendant Abbott Laboratories, Inc.'s Reply in Support of its Motion for Summary Judgment, PP. 2-3).  The pertinent allegation in the Complaint, however, states as follows:  "***On or about*** December 1, 2009, CPC permanently ceased to have an obligation to contribute to the Central States Pension Fund…." (Complaint, ¶ 14).  The Court finds this qualifying language is broad enough to encompass October 31, 2009, and further notes that Abbott had ample opportunity to inquire as to the specific date during discovery.

prior to the termination of the parties' contract, the Court cannot hold Abbott is entitled to

judgment as a matter of law simply because the final invoice issued after said termination.

**II.     Does The Unambiguous Language Of The Agreement Preclude Reimbursement For Withdrawal Liability?**

In its Motion for Summary Judgment, Abbott next asserts it is entitled to judgment as a

matter of law because the unambiguous language of the Agreement does not include

reimbursement for withdrawal liability.  (*See* Abbott's Memo in Support, PP. 12-16).   As

relevant here, the Agreement provided that Abbott agrees to "[p]ay [CPC] for services provided

in accordance with the applicable Schedules attached hereto, which payment shall be made

within ten (10) days from the date of each invoice and without deduction, reduction or set-off for

any reason."  (Agreement, ¶ 3(a)).  The April 2002 Schedule A provided in relevant part as

follows:

> [Abbott] will pay [CPC] for services rendered as follows:
>
> A.)     The amount of wages, fringe benefits and other payment required
> to be made by [CPC] under the Agreement, or pursuant to any collective
> bargaining agreement, statute or governmental regulation, including, but not
> limited to, all payments made to, for the benefit of or in any manner relating to the
> personnel supplied under the Agreement.

(April 2002 Schedule A, ¶ A).

Upon consideration the Court finds ambiguity in the Agreement and April 2002 Schedule

A, sufficient to preclude an entry of judgment in Abbott's favor.  As noted above, the Agreement

required Abbott to pay in accordance with the applicable Schedules.  The April 2002 Schedule A

in turn required Abbott to pay CPC the "amount of….other payment required to be made by

[CPC]….pursuant to any….statute….including, but not limited to, all payments made to, for the

benefit of or in any manner relating to the personnel supplied under the Agreement."  In viewing

the facts in the light most favorable to CPC, the Court finds any portion of the withdrawal

liability CPC paid to Central States that was attributable to drivers provided to Abbott constituted a payment made pursuant to statute, and relating to the personnel supplied under the Agreement.[10]  Abbott's arguments to the contrary simply confirm that ambiguities exist within the Agreement and April 2002 Schedule A.  This portion of Abbott's Motion for Summary Judgment must therefore be denied.

III.    **Does The Undisputed Extrinsic Evidence Conclusively Demonstrate The Parties Did Not Intend To Include Reimbursement For Withdrawal Liability In The April 2002 Schedule A?**

Abbott finally asserts that should the Court look beyond the four corners of the Agreement and April 2002 Schedule A, the undisputed evidence demonstrates the parties did not intend to include reimbursement for withdrawal liability.  (Abbott's Memo in Support, PP. 16-19).  As support for its position, Abbott notes that CPC's Vice President in charge of the Abbott account acknowledged withdrawal liability was not initially part of the parties' agreement, as follows:

> Q.    …when this [1992] agreement was entered into between TLI and Abbott, did you think at all about withdrawal liability at that time?
>
> A.    No.
>
> *    *    *
>
> Q.    So [the 1992 Schedule A] did not intend to address withdrawal liability, is that correct?
>
> A.    That's correct.

(*See* Abbott's Facts, ¶ 24).  Abbott further maintains the parties did not discuss withdrawal liability when CPC began supplying Abbott union drivers in the mid-1990s, nor did they discuss

---

[10] While the April 2002 Schedule A only required Abbott to pay CPC "for services rendered", the Court finds questions of fact remain with respect to whether the withdrawal liability payment at issue fit within such provision.

it in the context of any subsequent Schedules A. (Id., ¶¶ 27, 37, 39). According to Abbott, the first time CPC informed Abbott of its intent to hold Abbott partially responsible for withdrawal liability occurred in 2003, and Abbott responded to that communication by informing CPC in writing that the parties' Agreement did not include reimbursement for withdrawal liability. (Id., ¶¶ 55-56, 59). Because CPC neither ceased doing business with Abbott at that time, nor insisted upon altering the parties' Agreement to provide specifically for reimbursement for withdrawal liability, Abbott maintains the extrinsic evidence shows the obligation did not exist.

By way of response, CPC asserts the parties did contemplate reimbursement for withdrawal liability at the time they signed the original Agreement, and the Agreement provided for reimbursement of such should it be incurred at any point in the future. (Plaintiff CPC Logistics, Inc.'s Response to Defendant Abbott Laboratories' Motion for Summary Judgment, PP. 11-12). CPC further notes the April 2002 Schedule A rendered Abbott's potential reimbursement obligation more explicit, as it added new language designed to reflect the "pass through" nature of the parties' Agreement. (Id., PP. 10-11). In other words, CPC maintains the new language reflected the parties' understanding that the employment of union drivers carried with it new and different costs, necessitating a broad reimbursement obligation. (Id., P. 11). Finally, CPC asserts it warned Abbott of its potential withdrawal liability during discussions in the 1980s, 1990s, and 2000s, subsequent to which Abbott signed identically worded Schedules A without requesting changes or the specific exclusion of reimbursement for withdrawal liability. (Id., PP. 12-13).

Upon consideration of the foregoing, the Court finds fact questions remain with respect to whether the parties contemplated withdrawal liability at the time they signed the Agreement and Schedules A, and/or whether they intended to include reimbursement for such as an obligation

on Abbott's part.  Under these circumstances, Abbott's Motion for Summary Judgment must be

denied.[11]

**CONCLUSION**

Accordingly,

**IT IS HEREBY ORDERED** that Defendant Abbott Laboratories, Inc.'s Motion for

Summary Judgment (ECF No. 104) is **DENIED**.

**IT IS FURTHER ORDERED** that Plaintiff's Motion for Summary Judgment (ECF No.

102) is **DENIED**.


Dated this  13th  Day of November, 2014.


                                    /s/ Jean C. Hamilton
                                    UNITED STATES DISTRICT JUDGE

---

[11] The presence of fact questions precludes the entry of judgment in CPC's favor as well.